In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1228 & 08-2254

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,

*Plaintiff-Appellee,*

and

CONSULTING FIDUCIARIES, INCORPORATED,

*Appellee,*

*v.*

CURRENT DEVELOPMENT CORPORATION and
GEORGE P. KLEIN, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1792—**Sidney I. Schenkier,** *Magistrate Judge.*

ARGUED DECEMBER 1, 2008—DECIDED MARCH 5, 2009

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* George Klein, the trustee of his
company's employee benefit plans, agreed to terminate

and distribute the plans' assets to its participants in order to settle a lawsuit with the Department of Labor. But instead of marking the end of his scrape with the Department, the consent decree proved to be only the beginning. Klein and his wife were also participants in the plans, and Klein finagled the termination so that they would receive more than their fair share. The Department, unwilling to let him off the hook, asked the magistrate judge (Sidney I. Schenkier, sitting with the consent of the parties), who had entered the consent decree, to intercede. The judge did just that, removing Klein as the trustee, forcing the sale of property formerly owned by the plans, and ordering Klein to make restorative payments. Klein now appeals these decisions.

George Klein apparently is the president and sole stockholder of Current Development Corporation (CDC), a real estate acquisition and development company. CDC sponsored two employee benefit plans that are covered by the Employee Retirement Income Security Act, 29 U.S.C. § 1002(3) (ERISA), which were administered and controlled by Klein. Both Klein and CDC are defendants in this case, but for simplicity's sake, and because they are essentially the same, we will refer to both as Klein.

From what we can glean from the record, Klein's problems started with his failure to timely submit some annual reports to the Department of Labor. The problems snowballed from there. The Department first filed suit in the district court because Klein dipped into the plans' funds to pay the legal expenses for his unsuccessful defense in the related administrative action. Klein and

the Department reached a settlement in that case, which was embodied in a consent decree. In it, the parties acknowledged that Klein had paid back the legal fees and Klein agreed to terminate the plans, distributing the assets—nearly $900,000 and a vacant parcel of land in Westmont, Illinois—to the plan participants. The consent decree enjoined Klein from violating his fiduciary duties under ERISA, and, as is common in consent decrees, the court retained jurisdiction to enforce compliance with the judgment.

To terminate the plans, Klein informed participants that they could take their share of the assets in either cash or in a combination of cash and a stake in the property owned by the plans. Almost everyone opted to take cash (one person elected to receive his share in a mixture of cash and property), which left Klein and his wife with a 97 percent interest in the land. Meanwhile, and unbeknownst to the participants, Klein was negotiating with the Village of Westmont to sell the property. Some early negotiations had fallen by the wayside through no fault of Klein's, but by September 2005, the Village was ready to buy the property for $2.3 million. Klein rejected this offer and, three weeks later, cashed out the plan participants (by then the two plans had merged). He calculated these payments off of an earlier appraisal of the property for $1.7 million dollars, without regard to the Village's offer for $600,000 more.

It wasn't long before the Department got wind of Klein's negotiations with the Village so it filed a motion, arguing that by low balling the value of the property Klein had

shortchanged the participants who received their distributions in cash. Since the property was worth more than the $1.7 million, and Klein and his wife all but owned it, the calculations would give the Kleins more than they deserved. The Department sought Klein's removal as the plan's trustee, the appointment of an independent fiduciary in his stead, and the distribution to the participants of Klein's ill-gotten gains. Over objections, the judge concluded that Klein's actions amounted to a breach of his duty of loyalty to the participants. The judge removed him as the trustee, appointed Consulting Fiduciaries, Inc. (CFI) to be the independent fiduciary, and placed the Westmont property in a constructive trust, under CFI's care. CFI continued to negotiate with the Village for the sale of the property, and the two eventually settled on a price tag of $2.6 million. Klein filed a series of unsuccessful motions in hopes of stopping the sale, but the court rejected them all.

CFI also engaged an accounting firm to go through CDC's books to make sure that Klein's previous withdrawals from the plan were all on the up and up. Klein objected to this investigation, but the court allowed it to ensure that the sale proceeds would be fairly distributed. CFI eventually compiled a report (adopted in all relevant parts by the Department of Labor) which recommended that the court order Klein to restore $170,000 to the plan. CFI's submission included the accountant's report, which bolstered the recommendation with over a hundred pages of supporting evidence. Klein objected to some of the restorative payments and provided two brief affidavits to support his position. The court, how-

ever, agreed with the analysis of both CFI and the Department and so it ordered Klein to repay the plan.

The court then asked the parties to weigh in on whether the refund should be paid back with prejudgment interest. Predictably, CFI and the Department thought assessing interest was appropriate, and Klein disagreed. Noting that prejudgment interest in ERISA cases is an element of complete compensation, the court imposed interest on the restorative payments. Klein filed a motion to reconsider, taking issue with the interest rate imposed, which the judge denied.

With all the dust settled, the judge turned to computing the payments due to the participants. Pursuant to the judge's order, CFI calculated the final distribution figures, taking into account the restorative payments and fees that Klein had been ordered to pay. Klein objected to the figures, claiming that CFI's calculations took an extra $140,000 from his accounts. Unpersuaded, the court adopted CFI's proposed distribution figures. Ten days later, Klein repeated this same argument, to no avail, in a motion to reconsider.

The first controversy we must address is jurisdictional—and what a controversy it is. Our involvement began with Klein's notice of appeal challenging the judge's denial of his motion to reconsider the prejudgment interest rate. The Department filed a motion to dismiss the appeal, arguing that the judge's decision was not a final, appealable order, which we ordered taken with the case. Meanwhile, the judge determined the final payments to be made to the plan participants. Following an

unsuccessful motion to reconsider, Klein filed a second notice of appeal, challenging the court's distribution figures. We consolidated both of Klein's appeals. With all these fits and starts, it's not surprising that the parties have very different takes on the scope of our jurisdiction.

Title 28 U.S.C. § 1291, of course, empowers us to review a district court's final decisions. The consent decree, which wrapped up the Department's initial suit, was a final order. *See Jones-El v. Berge*, 374 F.3d 541, 543 (7th Cir. 2004). That means that the judge's enforcement orders are postjudgment orders. We treat each postjudgment proceeding like a freestanding lawsuit and look for the final decision in that proceeding to determine the scope of our review. *Id.*; *Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998). This inquiry takes us into "rocky terrain," *Jones-El*, 374 F.3d at 543, since determining what constitutes a final decision can be tricky. But the impetus of the postjudgment proceedings is a good place to start—an order that addresses all the issues raised in the motion that sparked the postjudgment proceedings is treated as final for purposes of section 1291. *JMS Dev. Co. v. Bulk Petroleum Corp.*, 337 F.3d 822, 825 (7th Cir. 2003).

These postjudgment proceedings began when the Department filed a motion seeking Klein's removal as trustee and the redistribution of any of his ill-gotten gains, and thus would not end until both issues were addressed. Klein claims that both issues were resolved by the time the judge ordered that he pay prejudgment

interest, making his first notice of appeal timely. Up to that point, the judge had removed Klein as the trustee, replaced him with CFI, approved the sale of the property, and ordered Klein to restore $170,000 to the plan. Klein describes what was left to do—the final calculation of the amount of money each former participant would receive—as nothing more than a ministerial detail that would not affect the finality of the court's order. *See Dzikunoo v. McGaw YMCA*, 39 F.3d 166, 167 (7th Cir. 1994). That's a stretch. The payments were one of the twin purposes of the suit and involved millions of dollars, to be divvied up amongst nearly 40 beneficiaries. Determining the payments wasn't a matter of simply plugging numbers into a court-approved equation, as Klein would have us believe. The parties had, and indeed continue to have, substantial disagreements regarding the figures. Therefore, we conclude that the postjudgment proceedings were not final until the court determined the distribution figures. Since Klein filed a timely notice of appeal following that decision, we have jurisdiction to consider this appeal.

The Department agrees that the order regarding the distribution figures is final and appealable but argues that the court's earlier orders—including its decision to remove Klein as the trustee, impose a constructive trust on the property, and appoint CFI as the independent fiduciary—were final and appealable when issued. Because Klein didn't file notices of appeal following these decisions, the Department argues that we lack jurisdiction to address challenges to these issues. We disagree. Klein was entitled to wait until the proceedings

were over and then appeal, bringing before us all the nonmoot interlocutory rulings adverse to him, including those that the Department now claims are outside of our jurisdiction. *Pearson v. Ramos*, 237 F.3d 881, 883 (7th Cir. 2001). To hold otherwise would invite litigants to appeal every procedural order that follows the entry of a consent decree, resulting in "an unmanageable proliferations of appeals." *Alliance to End Repression v. City of Chicago*, 356 F.3d 767, 773 (7th Cir. 2004).

Our jurisdiction is secure, but before we can turn to the merits we must tackle one more issue—the standard of proof required in this case. Klein characterizes the proceeding as one for civil contempt and therefore reasons that the Department must prove that he violated the consent decree by clear and convincing evidence. *See Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008). By failing to hold the Department to this heightened standard, Klein contends that the court committed reversible error. This argument is a nonstarter. The Department never sought a finding that Klein was in civil contempt, nor did the judge make such a finding. Nor, for that matter, did Klein ever assert before the judge that this heightened standard should apply. Klein can run afoul of the consent decree without subjecting himself to a contempt order—not all violations of a consent decree amount to civil contempt. *See id*. And in any event there is ample evidence to meet even this heightened burden of proof. Most of the court's conclusions were based on undisputed material facts, and to the extent there were disputes, the Department provided overwhelming support for its position in

the face of Klein's anemic evidence (more on this later). *See Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Ams. LLC*, 516 F.3d 623, 625-26 (7th Cir. 2008) (declining to weigh in on a dispute regarding the burden of proof because the court's findings would "suffice on any standard").

Finally, then, to the merits. Klein first wages a series of attacks on the court's finding that he breached his duty of loyalty to the plans. He begins by asserting that the court violated his right to due process when it reached this conclusion without holding an evidentiary hearing. One slight problem: Klein never asked for an evidentiary hearing. During oral argument, counsel for Klein explained that he assumed such a request was unnecessary. The right to an evidentiary hearing can be forfeited if the litigant fails to timely raise the issue, *United States v. Downs*, 123 F.3d 637, 644 (7th Cir. 1997), and Klein makes no attempt to identify a plain error that would justify our intervention. *Moore v. Tuleja*, 546 F.3d 423, 430 (7th Cir. 2008). What's more, "even for the most important decisions, an evidentiary hearing is required only if there are material factual disputes," *Wozniak v. Conry*, 236 F.3d 888, 890 (7th Cir. 2001), and while Klein identifies some factual ambiguities in the record, none of those potential disputes are material.

Klein also maintains that the consent decree put him in an untenable dilemma, with conflicting duties of loyalty. If he valued the property too high, then those who elected to take their share in property would be shortchanged if the property eventually sold for less. If

he valued the property too low, than the participants who elected to receive cash would get less than their fair share, since the property could be sold for more. This argument, however, misses the point. All the plan participants would have benefitted from a distribution based on an accurate valuation of the property, which Klein failed to do. During the negotiations, Klein rejected one of the Village's early offers for $2.3 million because it fell so far below the market value of the property that he feared accepting it might constitute a breach of his fiduciary duties. Klein may have been grandstanding, but that rejection invites an obvious question: If Klein really thought that $1.7 million was a fair price for the property, why didn't he jump at the Village's offer for $2.3 million? The court settled this conundrum by concluding that Klein purposefully undervalued the property by using the $1.7 million appraisal to ensure that he and his wife, who pretty much owned the whole thing, would receive a windfall profit. We agree with this assessment—an accurate valuation of the property would have taken into account the Village's offers. As a fiduciary of the plan, Klein was required to discharge his duties "solely in the interest of the participants," 29 U.S.C. § 1104(a)(1), and seeking benefit for himself at the expense of the participants falls short of this duty.

But even if we bought Klein's catch-22 argument, the court's conclusion would still stand. As a fiduciary, Klein was required to "communicate material facts affecting the interests of beneficiaries." *Anweiler v. Am. Elec. Power Serv. Corp*, 3 F.3d 986, 991 (7th Cir. 1993); *see also Bowerman*

*v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). The duty to communicate exists when a participant "asks fiduciaries for information, and even when he or she does not." *Anweiler*, 3 F.3d at 991. The ongoing negotiations with the Village had a profound impact on the value of the plan's assets. They provided concrete evidence suggesting that the market value of the property was well above the value listed in the last appraisal and that the property, though not as liquid as cash, could be quickly sold. This information was vital, particularly when the plan was being terminated and participants needed to chose how they would receive their take. But instead of sharing this information, Klein kept it under wraps. There is no excuse for this concealment.

Klein tries to get around these facts by arguing that his breach caused no harm to the plan participants, noting that there is no evidence that his failure to disclose the details of the negotiations with the Village would have affected the participants' decisions to forgo receiving a stake in the property. *See Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007) (requiring a showing that a breach of an ERISA fiduciary's duties caused harm). This argument, too, misses the mark. The participants who elected to receive their share in cash were shortchanged by Klein's decision to calculate the payments based on the $1.7 million appraisal. If Klein had been forthcoming about the negotiations and made an honest valuation of the property, the plan participants would have had reliable information upon which to make their election—be it all cash or a combination of cash and a property interest.

Klein next challenges the court's order requiring him to restore $170,000 to the plan—money used to pay legal expenses accumulated in his defense of the Department's administrative action and an IRS audit, to subsidize the salaries of full-time CDC employees, and to defray overhead costs that overlapped with CDC. Before getting into the nitty-gritty, Klein levels two general arguments against this order. First, he argues that CFI exceeded the scope of its duties by investigating the propriety of Klein's prior withdrawals from the plans. This argument is both odd and unsuccessful. For starters, the court explicitly authorized CFI to conduct this investigation. To the extent that Klein is suggesting that the judge lacked the authority to order such an investigation, he is also off base. The consent decree required Klein to terminate the plans, in accordance with the fiduciary duties he owed its participants, and the judge retained jurisdiction to make sure this was done. Plundering the plans for his own purposes would shortchange the participants, in contravention to Klein's fiduciary duties, and the court was entitled to authorize an investigation to make sure that the participants received their fair share.

Secondly, Klein argues that the court made a "unilateral determination" when it ordered him to repay the money without first conducting an evidentiary hearing. Klein's description of the court's decision is misleading. After CFI submitted its report regarding the prior withdrawals, Klein was given the opportunity to rebut the recommendations. He disputed some of CFI's recommendations but, as we have said, he never requested an evidentiary hearing. Because he forfeited his right to a hearing by failing to

request one and because he had an ample opportunity to respond to CFI's recommendations, we see no error in the court's course of action.

Having cleared the brushwood, we turn to the heart of Klein's dispute with the order for restorative payments. Klein first takes issue with the court's order requiring him to return $25,000 in legal expenses used to defend himself before the Department of Labor and IRS. Klein disagrees with CFI's characterization of the expenses and argues that the attorneys were actually billing for work related to the plan's administration. CFI provided the court with copies of the attorneys' contemporaneous time entries and billing records, which indicated otherwise. And the only evidence Klein provided to support his contention was a very brief declaration—just seven sentences long—written by one of the attorneys whose bills were at issue. In that declaration, the attorney, ignoring the contemporaneous records, stated that his work was "related to services [he] rendered as Trustee and not for legal services," without any elaboration as to what those services were. The attorney's declaration, which is nothing but a bald assertion, removed by years from the events being described, does not outweigh the numerous bills and records that supported the court's finding. *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (noting that an affiant's bald assertion of the general truth of a particular matter does not create a factual dispute).

The court also ordered Klein to repay $60,000 that he used to pay full-time employees of CDC and overhead

costs, such as telephone bills, copier charges, and pur-
chases of office supplies, that overlapped with CDC. ERISA
prohibits a fiduciary from transacting with interested
parties, such as CDC. 29 U.S.C. §§ 1102(14)(C), 1106(a)(1),
(b)(1). There is an exemption from this bar which allows
a fiduciary to contract or make reasonable arrangements
with a party in interest for "office space, or legal, account-
ing, or other services necessary for the establishment or
operation of the plan, if no more than reasonable compen-
sation is paid therefor." 29 U.S.C. § 1108(b)(2). Klein does
not deny that he made these payments using the plan's
assets but claims that this exemption applies because he
sought reimbursement only for administrative expenses
tied to running the plans.

But the record belies his argument. When CFI asked
for evidence that the overhead costs paid for were in
fact used by the plan, Klein provided nothing. He did
provide a declaration from an accountant—one of the
employees whose salary was subsidized—who stated
that he spent part of his time working on the plan, al-
though he failed to state with any level of specificity the
services he had rendered. In that declaration he estimated
the amount of time he had spent on plan matters, nearly a
decade after he had done the work. And although some
of the accountant's time records (submitted to the court
by CFI) suggest that he was working on plan matters for
a tiny fraction of the time he was receiving the subsidy,
that is not enough. The statute requires that the services
be pursuant to a contract or a reasonable arrangement,
that they are necessary for the plan's operation, and that
they cost no more than what's reasonable. 29 U.S.C.

§ 1108(b)(2); *Chao v. Malkani*, 452 F.3d 290, 296 (4th Cir. 2006). There is no evidence that these conditions were met. Without more, we are left with overwhelming evidence supporting the court's conclusion that Klein's withdrawals were prohibited by ERISA.

Klein also challenges the court's conclusion that he must restore $17,000 in appraisal and legal fees, which he maintains were spent on zoning and condemnation issues with regard to the property. Again, Klein provided no evidence to support this assertion. And even more devastating, Klein dipped into the plan to pay these fees long after the court removed him as the trustee. Klein makes no effort to confront the timing of the payments, and we find no error in the judge's conclusion that, to the extent Klein was spending money after he was removed as trustee, he was doing so "on his own watch and for his own purposes."

Next, Klein argues that the court erred when it imposed a constructive trust on the entire property, not just Klein's interest. Klein held 67 percent of the property following the termination of the plan and his wife held another 30 percent, leaving 3 percent in the hands of one of the other participants. Klein argues that neither his wife nor the participant should have had their interest in the property impaired without being joined in the case.

Even before we can reach the merits of this argument, Klein faces a couple of insurmountable problems. As an initial matter, while Klein urges that the rights of his wife and the former participant have been adversely

affected, he has never explained why he, and not they, is in the best position to protect those interests. *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000) ("[C]laims are best prosecuted by those who actually have been injured, rather than by someone in their stead."). What's more, Klein did not raise this argument until nine months after the judge imposed the constructive trust on the property. He first aired the argument in a motion to reconsider that order, in hopes of staving off the then-impending sale of the property. The argument was one sentence long, devoid of any citations to legal authority. It was not until Klein's *second* motion to reconsider that he supported his argument with any legal authority or reasoning. The court does have broad discretion to revisit its interlocutory orders, *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571 (7th Cir. 2006), but we find no abuse of that discretion here. Motions to reconsider are granted for "compelling reasons," such as a change in the law which reveals that an earlier ruling was erroneous, *id.*, not for addressing arguments that a party should have raised earlier. Klein was not entitled to a second—or in his case, a third—bite at the apple.

For the same reason, we reject Klein's argument that the prejudgment interest rate imposed on the restorative payments was too high. In response to a court order, CFI and the Department recommended that interest be assessed, but because CDC's records were too sketchy to glean the rates of return the plan had earned in the past, they recommended that the court impose a rate based on the one used to calculate underpayments of federal income taxes. *See* 26 U.S.C. § 6621. Klein objected

only to the imposition of interest, making no mention of the proposed rate or the plan's historical rate of return. Klein made a strategic choice to go all or nothing, a bet that turned out to be bad. The judge sided with the Department, and after noting that Klein had made no objection to the proposed interest rate, he accepted the Department's recommendation. Klein then filed a motion to reconsider, in which he raised, for the first time, an argument against the proposed rate of interest. This was too little, too late. Motions to reconsider empower the court to change course when a mistake has been made, they do not empower litigants to indefinitely prolong a case by allowing them to raise their arguments, piece by piece.

That leaves Klein's final argument. To end this labyrinthian proceeding, the court had to add up all the fees, reimbursements, and sales proceeds and divvy them up amongst the participants. Klein maintains that the court's final figures erroneously deducted an extra $140,000 from his account. This dispute stems from a mortgage that Klein took out on the property when he was terminating the plan. Because the majority of the plan's assets were tied up in the property, there wasn't enough cash on hand to pay all the participants who elected to receive their distributions in cash. In order to give each participant their share, in the form that they requested, Klein took out a loan, using the property as collateral. Of that loan, $140,000 was allocated to pay the participants at termination, which the court concluded was a legitimate use of the funds. For the final leg of the proceedings, CFI crunched the numbers to provide the judge proposed distribution figures. In doing so, CFI

created various spreadsheets, one of which included a column titled "Recognize Sales Proceeds Used to Pay Distributions from 2nd Mortgage." That column added up to $140,000, the amount of the loan apportioned to pay the participants. Klein argues that by including this column in its calculations, CFI forced him to pay the participants twice: once when the plan was terminated and again at the end of the postjudgment proceedings. CFI and the Department deny Klein's charge, claiming that the column was necessary for accounting purposes.

If Klein is right, then we should be able to track that $140,000 difference in CFI's final proposed figures and his own. But, as the judge noted when he rejected this same argument, "[t]he numbers don't tie out." Klein's first set of proposed figures gave him $270,000 more than what the Department had allocated, which goes well beyond compensating Klein for what was allegedly swiped from his account. After the court rejected his challenge, Klein filed a motion to reconsider and explained that his first figures did not include deductions for the expenses that the court had ordered him to pay. Attached was a new spreadsheet, which made a deduction under a column labeled "Adjustment to match amount available to distribute." That figure doesn't line up with anything in the Department's calculations and is $160,000 less than the total deductions that the Department proposed. This leaves us comparing apples to oranges. Klein gets more money under his calculations, but there is no way for us to attribute this difference to the alleged double payment. We defer to the court's factual findings unless there is clear error, *Girl*

*Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1087 (7th Cir. 2008), and nothing in Klein's muddled figures convinces us that such an error was made.

Accordingly, the Department of Labor's motion to dismiss is GRANTED. We DISMISS appeal no. 08-1228 for lack of jurisdiction and AFFIRM appeal no. 08-2254.