In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3413 & 12-2123

JPMORGAN CHASE BANK, N.A.,
successor in interest to
The First National Bank of Chicago,

*Plaintiff-Appellee,*

*v.*

ASIA PULP & PAPER COMPANY, LTD.,
PT. INDAH KIAT PULP & PAPER TBK., and
PT. PABRIK KERTAS TJIWI KIMIA TBK.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 6240—**James F. Holderman**, *Chief Judge.*

ARGUED NOVEMBER 1, 2011—DECIDED FEBRUARY 21, 2013

Before BAUER, FLAUM, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* These consolidated appeals arise out of a complicated financing arrangement put in place to underwrite Beloit Corporation's construction of two massive paper-making machines for a consortium of

paper manufacturers in Southeast Asia. Simplified, the basic facts are these: In 1996 Beloit agreed to build two high-speed paper-making machines for Indonesian paper companies PT. Indah Kiat Pulp & Paper Tbk. ("Indah Kiat") and PT Pabrik Kertas Tjiwi Kimia Tbk. ("Tjiwi Kimia"), subsidiaries of Asia Pulp & Paper Company, Ltd. ("Asia Pulp"), which is based in Singapore. (For simplicity, we refer to the companies collectively as "Asia Pulp" unless the context requires otherwise.) To finance construction, Indah Kiat and Tjiwi Kimia executed credit agreements and promissory notes in favor of Beloit reflecting a principal indebtedness of approximately $38 million, later increased to $43.8 million. Asia Pulp guaranteed the notes, and Beloit assigned them to JPMorgan Chase Bank, N.A. ("JPMorgan") in exchange for construction financing equal to the principal amount.

The machines were delivered in 1998 but did not run at the speeds specified in the contracts; there were other problems as well. In 2000 the parties entered into a settlement resolving all claims pertaining to the machines but specifically preserving Asia Pulp's obligations under the notes. Asia Pulp defaulted, and JPMorgan sued for nonpayment. Asia Pulp asserted multiple defenses and a counterclaim invoking various contract and fraud theories. In a series of decisions, the district court held that Asia Pulp's warranty-based claims were foreclosed by the settlement and its remaining claims lacked factual and legal support. The court entered judgment for JPMorgan for more than $53 million. Asia Pulp appealed, raising a host of arguments regarding the

viability of its defenses and counterclaim and also challenging the court's award of interest and attorney's fees.

Matters became a bit more complicated after we heard argument. After the appeal was filed, JPMorgan issued citations to discover assets on which to execute its large judgment. Asia Pulp moved to stay discovery based on an Indonesian injunction in an unrelated case, raising an interesting international conflict-of-law question. The district court denied the motion and ordered Asia Pulp to comply with the asset-discovery citations. Asia Pulp appealed this order as well.

We affirm the judgment. The district court correctly held that the settlement waived Asia Pulp's implied-warranty defenses and counterclaim. The fraud defense is mostly barred as well; to the extent it is not, Asia Pulp's evidence is wholly insufficient to survive summary judgment. Asia Pulp's remaining defenses—that the notes lacked consideration; that the notes were issued for a "special purpose" and were not intended to be repaid; and that JPMorgan is not a holder in due course—are all meritless. As to damages, the court properly awarded interest at the contractual default rate and attorney's fees as provided in the notes. Finally, we lack jurisdiction over Asia Pulp's appeal of the asset-discovery order. Postjudgment orders for the discovery of assets are nonappealable interlocutory orders, and the collateral-order doctrine does not apply.

## I. Background

The following account is from the summary-judgment record, which we construe in the light most favorable to Asia Pulp. On July 10, 1996, Beloit Corporation entered into two contracts with Asia Pulp to build two high-speed paper-making machines for its Indonesian subsidiaries, Indah Kiat and Tjiwi Kimia. These enormous machines—known as the PPM3 and the MPM11—are several stories high and about 200 meters long, roughly the length of two football fields. On May 12, 1997, Indah Kiat and Tjiwi Kimia assumed all of Asia Pulp's rights and obligations under the contracts. Specifically, Indah Kiat purchased the PPM3 machine and Tjiwi Kimia purchased the MPM11 machine.

To finance the construction of these huge machines, Indah Kiat and Tjiwi Kimia executed credit agreements and promissory notes in favor of Beloit in the original principal amount of $21,809,962.00 (the Indah Kiat note) and $16,213,352.95 (the Tjiwi Kimia note). Asia Pulp issued unconditional guarantees ensuring repayment of the notes. These transactions closed on April 25, 1998. That same day, Beloit entered into a Note Purchase Agreement with First National Bank of Chicago, JPMorgan's predecessor in interest,[1] assigning the notes to the bank in exchange for a line of credit in the amount of $38,023,314.95 to serve as partial construction financing for the PPM3 and MPM11 machines.

---

[1] JPMorgan eventually assumed First Chicago's interest in the notes. We refer only to JPMorgan throughout.

On September 24, 1998, the parties increased the principal amount on the Indah Kiat and Tjiwi Kimia notes to $26,701,678.00 and $17,123,488.95, respectively. Indah Kiat and Tjiwi Kimia issued amended promissory notes to Beloit reflecting the increased indebtedness, and Asia Pulp again unconditionally guaranteed payment. On September 30, 1998, Beloit and JPMorgan amended their Note Purchase Agreement to cover the amended notes, and JPMorgan increased Beloit's line of credit to $43,825,167.00.

The terms of the credit agreements and notes required Indah Kiat and Tjiwi Kimia to make principal and interest payments to JPMorgan in eight installments, the first due on September 30, 1998. The remaining payments were to be made semiannually until the notes were paid in full. Indah Kiat and Tjiwi Kimia made their scheduled payments beginning in September 1998 and continuing through October 2000.

When the machines came online in 1998, however, Asia Pulp employees identified several defects in their operation. The main performance problem was insufficient speed. Asia Pulp catalogues other design and mechanical defects in its brief, but the details are not important to this appeal.[2] It is enough to note that the

---

[2]  In brief, the claimed defects were these: (1) inability to reach the operational speed specified in the contracts; (2) incorrect design and mechanical function in the wire section resulting in low-quality paper; (3) incorrect mechanical function in the

(continued...)

parties resolved all disputes regarding the defects by a "Deed of Settlement" dated October 3, 2000. This agreement expressly settled and released all claims relating to the "Disputed Contracts"—that is, the contracts for the construction, sale, and purchase of the PPM3 and MPM11 machines. More specifically, the settlement released Beloit, its successors, and related companies, from "all claims . . . known or unknown . . . in connection with or in any way pertaining to" the construction, installation, or operation of the PPM3 and MPM11 machines.

Importantly, however, the Deed of Settlement expressly preserved the obligation of Indah Kiat, Tjiwi Kimia, and Asia Pulp to pay on the notes. On this point, the agreement stated as follows:

> The APP Parties [Asia Pulp, Indah Kiat, and Tjiwi Kimia] are not released from their obligations to pay or repay any promissory notes issued to [Beloit Corporation] or other financing or other loans relating to the PPM3 and MPM11 Contracts . . . . In addition, the Beloit Entities' rights with respect to such promissory notes, financings and loans are not [a]ffected by this Deed.

Despite this explicit reservation of rights and obligations under the notes, Asia Pulp and its subsidiaries made

---

[2] (...continued)

press section resulting in shutdowns and increased operational expenses; (4) a flaw in the drying section making it difficult to operate and limiting its speed; and (5) flaws in the sizer, calendar, and reel sections resulting in increased operational expenses.

no further payment. Early in 2001 Asia Pulp issued a "standstill" letter to all its creditors—including JPMorgan—announcing a freeze of interest and principal payments on all Asia Pulp debt, including the debt of its subsidiaries Indah Kiat and Tjiwi Kimia. The standstill letter had nothing to do with the PPM3 and MPM11 machines; rather, the stated reason for the debt-payment freeze was Asia Pulp's corporate restructuring.

In September 2001 JPMorgan sent Asia Pulp a notice of default. The bank had not been paid since October 2000, and missing a principal or interest payment automatically caused the notes to mature, making all unpaid principal and accrued interest due immediately. In addition, the notes and credit agreements allowed for recovery of default interest and "fees and disbursements of counsel." Payment was not forthcoming, so JPMorgan initiated this suit against Asia Pulp, Indah Kiat, and Tjiwi Kimia to collect money due on the notes.

## A. The Litigation

The defendants vigorously contested JPMorgan's suit, asserting multiple affirmative defenses to liability and a counterclaim premised on various contract and fraud theories. Specifically, they alleged that: (1) Beloit breached several implied warranties;[3] (2) Beloit misrepresented its

---

[3] The first, second, and fourth affirmative defenses alleged breach of the implied warranty of merchantability, breach of
(continued...)

design and construction expertise and fraudulently represented that the notes were only a temporary construction-financing measure;[4] (3) the notes were issued as "special purpose" financing only and lacked consideration;[5] and (4) JPMorgan was not a holder in due course.[6] JPMorgan moved for summary judgment. In three separate orders, the district court, Judge James F. Holderman, granted summary judgment in favor of JPMorgan and against the three defendants.

First, on October 14, 2009, the court granted summary judgment in favor of JPMorgan and against Indah Kiat and Tjiwi Kimia, rejecting their various defenses to liability on the notes. The court held that the implied-warranty defenses were barred by the Deed of Settlement and the remaining defenses were factually and legally deficient. On April 21, 2010, the court granted summary judgment in favor of JPMorgan and against Asia Pulp, rejecting the same affirmative defenses as

---

[3] (...continued)
the implied warranty of fitness, and breach of an implied warranty entitling Indah Kiat and Tjiwi Kimia to consequential damages. The counterclaim was also based on an alleged breach of implied warranty.

[4] The fraud allegations are contained in Asia Pulp's third affirmative defense.

[5] These allegations are contained in Asia Pulp's fifth and sixth affirmative defenses.

[6] This claim is contained in Asia Pulp's seventh affirmative defense.

well as the counterclaim. In this order the court also determined damages (including contractual interest), but reserved consideration of attorney's fees. On September 13, 2010, the district court modified the damages award and added attorney's fees as provided in the notes. This order entered final judgment for JPMorgan as follows:

> (1) judgment against Indah Kiat in the amount of $31,904,510.92 (principal and interest on the Indah Kiat note) plus $251,820.63 in attorney's fees and costs, for a total of $32,156,331.55;

> (2) judgment against Tjiwi Kimia in the amount of $21,088,185.59 (principal and interest on the Tjiwi Kimia note) plus $251,820.63 in attorney's fees and costs, for a total of $21,340,006.22; and

> (3) judgment against Asia Pulp for the combined total of $53,496,337.77.

(Forgive the exquisite detail; in light of the issues raised on appeal, we cannot omit it.) Asia Pulp filed a timely notice of appeal designating all three merits orders (dated October 14, 2009; April 21, 2010; and September 13, 2010). This is Appeal No. 10-3413.

## B.  Postjudgment Collection Proceedings

Having won a very large judgment, JPMorgan sought to protect its enforcement options while the appeal was pending. On October 19, 2010, JPMorgan issued citations to discover assets on which to execute its judg-

ment. Asia Pulp moved to stay enforcement of the citations, claiming that a "Provisional Injunction" issued by an Indonesian court in 2008 in an unrelated case prohibited it from complying with postjudgment collection proceedings. Judge Holderman referred the motion to Magistrate Judge Geraldine Soat Brown, and on November 16, 2011, she rejected Asia Pulp's argument and ordered it to comply with the asset-discovery citations. Asia Pulp moved for reconsideration, but Judge Brown denied the motion. Asia Pulp then filed objections with the district court pursuant to Rule 72(a) of the Federal Rules of Civil Procedure. On January 10, 2012, Judge Holderman set a briefing schedule.

Eight days later, however, Asia Pulp filed a notice of appeal purporting to appeal Magistrate Judge Brown's ruling. This appeal was docketed as Appeal No. 12-1136. We questioned appellate jurisdiction and issued a jurisdictional order. In the meantime Judge Holderman entered an order overruling Asia Pulp's objections, confirming the soundness of Magistrate Judge Brown's conclusions, and ordering Asia Pulp to comply with the asset-discovery citations.[7] The court held that Asia Pulp

---

[7] Although the "filing of a timely notice of appeal confers jurisdiction over the matter on the court of appeals and divests the district court of its control," *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1240 (7th Cir. 1986), that "rule does not operate . . . where there is a purported appeal from a non-appealable order," *United States v. Bastanipour*, 697 F.2d 170, 173 (7th Cir. 1982). Magistrate Judge Brown's ruling was a

(continued...)

had not established that it would be subject to sanctions under the Indonesian injunction if forced to comply with the asset-discovery citations. The court also held that principles of international comity favored enforcement of the citations. After unsuccessfully moving for reconsideration, Asia Pulp filed a notice of appeal from the district court's postjudgment orders. This is Appeal No. 12-2123.

Because the magistrate judge's ruling was not a final, appealable order, we dismissed Appeal No. 12-1136 for lack of appellate jurisdiction. We consolidated the remaining appeals and ordered the parties to specifically address the question of appellate jurisdiction in Appeal No. 12-2123, Asia Pulp's appeal from Judge Holderman's order denying the motion to stay and compelling compliance with the asset-discovery citations. The consolidated appeals are now ready for decision.

## II. Discussion

The case is before the court following the grant of summary judgment in favor of JPMorgan, so our review is de novo. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). The district court held that Asia Pulp is liable on the notes and that its counterclaim and affirmative de-

---

[7] (...continued)
nonappealable order, so the district court's jurisdiction over the supplementary proceedings was intact notwithstanding Asia Pulp's attempted appeal from her order.

fenses were either barred by the Deed of Settlement or lacked factual and legal support. The court entered judgment for the unpaid principal amount, plus interest at the contractual default rate and attorney's fees as provided in the credit agreements and notes.

On appeal Asia Pulp presses its counterclaim and affirmative defenses, and also challenges the award of interest at the contractual default rate and attorney's fees. The basic facts are uncontroverted; the appeal turns on legal conclusions regarding the contract defenses and counterclaim, and whether Asia Pulp's fraud evidence is sufficient to get to a jury. In reviewing the district court's grant of summary judgment, we draw all reasonable inferences in favor of the nonmoving party, here Asia Pulp. *Id.* Summary judgment is appropriate if there are no material factual disputes for trial and JPMorgan is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)). To establish a material factual dispute, Asia Pulp must present evidence that would permit a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Before turning to the merits, however, we must clear some procedural underbrush.

## A. The Scope of the Appeal

As a threshold matter, JPMorgan argues that certain language in the first notice of appeal limits our jurisdiction to the claims involving Indah Kiat only. Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure requires

that a notice of appeal "designate the judgment, order, or part thereof being appealed." Although the requirements of Rule 3 are "jurisdictional in nature, and their satisfaction is a prerequisite to appellate review," we generally construe the notice requirements liberally. *Smith v. Barry*, 502 U.S. 244, 248 (1992) (citing *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316-17 (1988)).

Asia Pulp's first notice of appeal designates three orders as the subject of the appeal:

> (1) [the] October 14, 2009 Order granting JP Morgan's motion for summary judgment against defendants [Indah Kiat] and [Tjiwi Kimia]; (2) [the] April 21, 2010 Order granting JP Morgan's motion for summary judgment against defendant [Asia Pulp]; and (3) [the] September 13, 2010 Order[] amending the April 21, 2010 judgment and awarding damages in the total amount of $32,156,331.55.

Note the language of subpart (3) of the notice, which identifies the September 13, 2010 order but goes on to specifically mention the award of damages in the amount of $32,156,331.55, which corresponds to the award against Indah Kiat only. As we have earlier explained, the September 13, 2010 order modified the damages determination contained in the court's April 21 order, awarded attorney's fees, and entered final judgment as follows: judgment against Indah Kiat in the total amount of $32,156,331.55; judgment against Tjiwi Kimia in the total amount of $21,340,006.22; and judgment against Asia Pulp for the combined total of $53,496,337.77.

JPMorgan argues that by specifying the amount of damages awarded against Indah Kiat *only*, the notice of appeal limits our review to that part of the judgment. We disagree. The notice designates all three orders by which the district court addressed the merits of the case and reached final judgment, culminating in the court's order on September 13, 2010, which encompassed the judgment against all three defendants. Read as a whole, we think the notice "sufficiently demonstrate[s] [the] intention to appeal all orders previously issued by the district court." *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 626 (7th Cir. 1993). The requirements of Rule 3 are satisfied when the matters appealed can be readily inferred from the text of the notice and the appellee has not been misled. *See Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1125 (7th Cir. 1996); *see also United States v. Michelle's Lounge*, 39 F.3d 684, 691-92 (7th Cir. 1994) (notice of appeal identifying orders "otherwise denying any adversary hearing" satisfies Rule 3 even though it does not more specifically identify the order appealed from).

Considered in context, the specific mention of only a subset of the total damages—the amount awarded against Indah Kiat—is best explained as a clerical error, not an attempt to limit the scope of the appeal. The notice listed all three orders that together comprise the district court's disposition of JPMorgan's claims against the three defendants *in toto*. Asia Pulp's opening brief, which addresses the liability of all three defendants, confirms that no limitation was intended, and JPMorgan does not claim to have been misled. Accordingly, all three or-

ders—including the September 13, 2010 order in its entirety—are properly before the court.

## B. Summary Judgment

Asia Pulp's counterclaim and three affirmative defenses are premised on breach-of-warranty theories relating to the PPM3 and MPM11 contracts. The district court held that these claims are barred by the Deed of Settlement. A fourth affirmative defense alleges that Beloit made certain material misrepresentations to induce Indah Kiat and Tjiwi Kimia to enter into the credit agreements and issue the notes. The district court held that the fraudulent inducement defense is not barred by the Deed of Settlement but lacks factual support on the merits. The court also rejected Asia Pulp's remaining contract defenses and entered judgment for the balance due on the notes, plus contractual interest and attorney's fees. Asia Pulp challenges every one of these rulings.

### 1. *The Deed of Settlement*

The Deed of Settlement comprehensively releases Beloit, its successors, and related companies from all claims arising from or relating to the "Disputed Contracts"—that is, the contracts for the construction, sale, and installation of the PPM3 and MPM11 machines. Importantly, however, the Deed of Settlement *specifically preserves* the obligation of Asia Pulp and its subsidiaries to pay on the notes. As Beloit's assignee and successor

on the notes, JPMorgan may assert Beloit's rights under the notes and the Deed of Settlement. *See Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 864 (7th Cir. 1997) ("[E]lementary contract law provides that upon valid and unqualified assignment the assignee stands in the shoes of the assignor and assumes the same rights, title and interest possessed by the assignor." (citation omitted)).

Clause 10 of the Deed of Settlement contains the provisions relevant here. First, Clause 10(A) contains Beloit's release of rights:

> Each of the Beloit Entities and Harnischfeger hereby releases the [Asia Pulp] Parties . . . from all claims and waives all rights against them, whether such claims or rights are known or unknown, accrued or to accrue, in connection with or in any way pertaining to the Disputed Contracts, except as set forth in Clause 10(C).

Clause 10(B) contains Asia Pulp's release of rights:

> Each of the [Asia Pulp] Parties hereby releases the Beloit Entities and Harnischfeger . . . from all claims and waives all rights against them, whether such claims or rights are known or unknown, accrued or to accrue, in connection with or in any way pertaining to the Disputed Contracts. [Asia Pulp] agrees to indemnify the Beloit Entities and Harnischfeger against any claims arising out of and in connection with the Disputed Contracts by the [Asia Pulp] Parties.

Finally, Clause 10(C) unequivocally states that the settlement does not affect Beloit's right to enforce the notes

and does not release the obligation of Asia Pulp and its subsidiaries to pay on the notes:

> The [Asia Pulp] Parties are not released from their obligations to pay or repay any promissory notes issued to [Beloit Corporation] or other financing or other loans relating to the PPM3 and MPM11 Contracts . . . . In addition, the Beloit Entities' rights with respect to such promissory notes, financings and loans are not [a]ffected by this Deed.

Our interpretation of the Deed of Settlement is governed by principles of contract law—here, the contract law of Illinois. *Capocy v. Kirtadze,* 183 F.3d 629, 632 (7th Cir. 1999). The scope and effect of the release depend on the intent of the parties, but we "determine this intent 'from the language used and the *circumstances of the transaction.*'" *Id.* (quoting *Carlile v. Snap-On Tools,* 648 N.E.2d 317, 321 (Ill. App. Ct. 1995)). Absent ambiguity, the question presented is one of law. *Id.* (citing *Gavery v. McMahon & Illiott,* 670 N.E.2d 822, 824 (Ill. App. Ct. 1996)). There is no ambiguity here.

Clause 10(C) expressly excludes the promissory notes from the release, so the obligation to pay survives the settlement and JPMorgan retains the right to enforce that obligation. In contrast, in Clause 10(B) Asia Pulp and its subsidiaries release all claims and waive all rights against Beloit and its successors without qualification. The release language is comprehensive, encompassing "*all* claims . . . *known or unknown* . . . in connection with or *in any way pertaining to* the Disputed Contracts." (Emphases added.) This language covers the implied-

warranty defenses and counterclaim asserted here. These claims are based on design and construction defects well known to the parties on October 3, 2000, when the Deed of Settlement was executed. Indeed, the whole point of the settlement was to resolve all claims pertaining to the myriad performance problems of the PPM3 and MPM11 machines.

According to the uncontroverted evidence (much of it from Asia Pulp's own employees), the machines had serious problems immediately following their installation in 1998—two years before the parties signed the Deed of Settlement. In 1997 Tjiwi Kimia hired away Beloit's project manager Robert Prutzman, whose job was to oversee the installation and operation of the machines. In a sworn declaration, Prutzman stated that he was never able to get the PPM3 and MPM11 to work at their target speeds. Also in the record is a sworn declaration from Aarno Tuomenoja, who was apparently an engineer or supervisor in charge of technology at Asia Pulp during the relevant time period. He recounted that after the machines were received, "field level employees . . . reported that the machines would not run at the speeds required in the contract." He itemized other defects as well. As such, Asia Pulp was well aware of possible warranty claims long before October 2000 when the Deed of Settlement was signed. The implied-warranty affirmative defenses and counterclaim are plainly barred by the terms of the settlement.

The same is true of the fraudulent-inducement defense, at least to the extent that this defense is premised on

alleged misrepresentations about the PPM3 and MPM11 machines. Asia Pulp complains of two distinct misrepresentations. First, it contends that Beloit falsely represented that it had the experience and skill necessary to design and build the PPM3 and MPM11 to the desired specifications. Second, it claims that Beloit falsely represented that the promissory notes would be temporary or "interim" financing only, inducing Asia Pulp and its subsidiaries to believe that the notes would not have to be repaid.

The first of these misrepresentations relates directly to the performance problems of the PPM3 and MPM11 machines. As factual support for this claim, Asia Pulp relies primarily on Prutzman's declaration that Beloit had never designed or manufactured machines to the specifications and quality required by the PPM3 and MPM11 contracts. But Prutzman began working for Tjiwi Kimia in 1997, so Asia Pulp was aware of Beloit's alleged misrepresentation on this score *three years before* the Deed of Settlement was executed. To the extent that the fraud defense is based on misrepresentations about Beloit's design and construction experience, it falls squarely within the release in the Deed of Settlement and is therefore barred.

The misrepresentation about the nature of the credit transaction is another matter, however. This aspect of the fraudulent-inducement defense does not pertain to the "Disputed Contracts" *per se*; it pertains to the associated construction financing. We do not need to decide whether the release language in the Deed of Settlement

is broad enough to bar this part of the claim; we agree with the district court that it fails on the merits. To survive summary judgment, Asia Pulp needed clear and convincing evidence on the following elements: (1) Beloit made a false statement of material fact; (2) knowing it was false or in reckless disregard of its truth or falsity; (3) with intent to induce Indah Kiat and Tjiwi Kimia to enter into the credit agreement and issue the notes, and to induce Asia Pulp to guarantee repayment; (4) Indah Kiat, Tjiwi Kimia, and Asia Pulp reasonably believed the false statement to be true and acted in justifiable reliance on it; and (5) damages as a result of their reliance on the misrepresentation. *See Kapelanski v. Johnson*, 390 F.3d 525, 530-31 (7th Cir. 2004) (applying Illinois law); *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 569 (7th Cir. 1991) (applying the clear-and-convincing evidentiary standard in affirming a summary judgment dismissing a fraud claim). Asia Pulp's evidence falls far short on several elements of the claim; there are legal barriers as well.

To repeat, Asia Pulp asserts that Beloit falsely represented that the notes were temporary or "interim" financing and that it would secure permanent financing elsewhere, and that this representation led Asia Pulp and its subsidiaries to believe that they would not have to repay the notes. There are several problems with this claim. First, it is a claim of promissory fraud; that is, Asia Pulp contends that Beloit made a promise—that it would secure permanent financing elsewhere—with no present intention of fulfilling it. But Illinois does not recognize a cause of action for promissory fraud. *Indep. Trust Corp. v.*

*Fid. Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1038-39 (N.D. Ill. 2008); *see also BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011). Although an exception exists for certain fraudulent schemes, it only applies if the misrepresentation is embedded in a larger pattern of deception or the deceit is particularly egregious. *See Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1354 (7th Cir. 1995). There is no evidence of that here. Asia Pulp alleges a garden-variety promissory fraud.

Second, the evidence does not begin to show, let alone clearly and convincingly, that Beloit actually made the alleged false representation knowing it to be false. To the extent that the representation about permanent financing was actually made (the evidence of this is skeletal and lacking in specifics), there is no evidence that it was false when made or that Beloit knew it was false. Tuomenoja merely *asserts* that Beloit "had no intention of acting on its representation." Asia Pulp has no *evidence* to back up this assertion.

Proof of justifiable reliance is also lacking. Asia Pulp claims that it reasonably believed, based on Beloit's misrepresentation about permanent financing, that it would not have to repay the notes. No record evidence supports this contention. To the contrary, Indah Kiat and Tjiwi Kimia paid on the notes for two years before defaulting. Asia Pulp has not explained why these payments were made if indeed it believed it did not have to repay the notes. Moreover, Asia Pulp and its subsidiaries expressly acknowledged their continued liability on the notes in the Deed of Settlement, which specifically

preserved their obligation to pay. In short, whether or not it was barred by the Deed of Settlement, Asia Pulp's fraudulent-inducement defense is legally and factually unsupported.

### 2. *Remaining Affirmative Defenses*

In another twist on the same theme, Asia Pulp insists that the notes are unenforceable because they were issued for a "special purpose"—that is, as temporary or "interim" financing—and were never intended to be repaid.[8] As Judge Holderman aptly put it, this argument "defies common sense." Asia Pulp has not explained how this putative "special purpose" extinguishes its obligation to repay the notes. The terms of the credit agreements and notes plainly specify a repayment schedule and bind Indah Kiat and Tjiwi Kimia to pay the notes in full. Asia Pulp unconditionally guaranteed repayment. No bank would extend $40 million in credit

---

[8] The only factual support for this so-called "special purpose" defense is a statement in the Tuomenoja declaration that "th[e] promissory note was meant to be a temporary measure." The district court excluded this statement under the parol-evidence rule. This evidentiary ruling was sound. *Main Bank of Chi. v. Baker*, 427 N.E.2d 94, 100 (Ill. 1981) ("[A]lthough article 3 of the [Uniform Commercial] Code allows an instrument to be modified by a separate writing executed contemporaneously, . . . it otherwise follows the parol evidence rule that prior or collateral oral agreements are inadmissible to contradict the express terms of a written instrument.").

in exchange for illusory promissory notes. And as we have noted, Indah Kiat and Tjiwi Kimia made payments on the notes from September 1998 to October 2000, and the Deed of Settlement, signed on October 3, 2000, specifically preserved their obligation to pay. Nothing further need be said on this point.

Asia Pulp also argues that the notes lacked consideration. Consideration is "a bargained-for exchange, whereby the promisor . . . receives some benefit, or the promisee . . . suffers detriment." *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 2005). Under the relevant section of Illinois's version of Article 3 of the Uniform Commercial Code, "any consideration sufficient to support a simple contract" satisfies the consideration requirement. 810 ILL. COMP. STAT. 5/3-303(b). A validly executed negotiable instrument is presumed to be supported by consideration. *Pedott v. Dorman*, 548 N.E.2d 541, 546 (Ill. App. Ct. 1989). A clause stating that an instrument was given "for value received" ordinarily is sufficient evidence of consideration. *Id.*

The notes state that they were issued "for value received," and Asia Pulp does not dispute that they were validly executed. Consideration is therefore presumed, and although the presumption may be rebutted, "the evidence offered in rebuttal must be of a very clear and cogent nature." *Id.* Asia Pulp offers no evidence in rebuttal, much less "clear and cogent" evidence. Instead, it advances an argument from the existence of the underlying construction contracts; that is, Asia Pulp argues that its promise to repay the notes brought no new rights

in return beyond those already contained in the PPM3 and MPM11 contracts. We fail to see—and Asia Pulp does not explain—how this operates to defeat the presumption of consideration. The notes served as partial construction financing, necessary for the completion and delivery of machines, and were thus an integral part of the larger transaction. The lack-of-consideration defense is meritless.

Finally, Asia Pulp argues that JPMorgan is not a holder in due course of the notes. But this issue comes into play only if Asia Pulp has an affirmative defense that survives summary judgment. *See Bank of N.C., N. A. v. Rock Island Bank*, 630 F.2d 1243, 1246 (7th Cir. 1980). In other words, assuming it has the status of a holder in due course, JPMorgan would have a trump card to play against an otherwise valid defense to liability on the notes. *See id.* Because Asia Pulp has no valid affirmative defense, the question is irrelevant.

## C. Damages

Asia Pulp challenges the damages award on two grounds: (1) the district court should not have calculated interest using the increased default rate specified in the notes; and (2) the court should not have awarded attorney's fees.[9] We find no error on either point.

---

[9] Asia Pulp also claims that the damages award should have been "mitigated" based on Beloit's fraud. This argument has no factual or legal support.

Under the terms of the credit agreements and notes, a slightly higher interest rate applies in the case of a default. For the Indah Kiat note, the rate increases from 2.17% to 3.125%. For the Tjiwi Kimia note, the rate increases from 2.29% to 3.125%. Asia Pulp claims that these provisions are unenforceable penalty clauses. The district court rejected this argument and calculated interest on the principal balance due on the notes using the 3.125% rate. Whether the rate increase is an unenforceable penalty clause is a question of law, so our review is de novo. *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001).

A contractual provision is an unenforceable penalty clause when its sole purpose "is to secure performance of the contract." *Id.* Although doubtful cases are resolved "in favor of classification as a penalty," *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985), Illinois courts routinely uphold reasonable postdefault increases in interest rates as valid liquidated-damages provisions, *see, e.g.*, *Baker v. Loves Park Sav. & Loan Ass'n*, 333 N.E.2d 1, 5-6 (Ill. 1975) (upholding a clause providing for a 1% increase in interest rate upon default). Unlike fixed fees for a breach of contract bearing no relationship to actual damages, here the small postdefault rate increase—less than 1%—was entirely reasonable in light of anticipated losses associated with default, especially because actual damages from a breach would have been difficult to measure at the time of contract formation. *See Checkers Eight*, 241 F.3d at 562. We agree with the district court that the post-default interest-rate increase is a valid and enforceable liquidated-damages clause.

Asia Pulp's challenge to the award of attorney's fees fares no better. Illinois requires that contractual fee-shifting provisions be clear and specific. *See, e.g.*, *Estate of Downs v. Webster*, 716 N.E.2d 1256, 1260 (Ill. App. Ct. 1999) ("When the language does not specifically state that 'attorney fees' are recoverable, courts will not give the language an expanded meaning."); *Qazi v. Ismail*, 364 N.E.2d 595, 596-97 (Ill. App. Ct. 1977) (stating that "specific language" is required for an enforceable fee-shifting provision). Here, the credit agreements specify that "[t]he Borrower agrees to pay and save the Lender harmless against liability for the payment of . . . *the fees and disbursements of counsel to the Lender*." (Emphasis added.) Asia Pulp insists that the phrase "fees and disbursements of counsel to the Lender" is not specific enough. We fail to see the ambiguity. The cases do not require that a contractual fee-shifting provision must use the magic words "attorney's fees" to be enforceable. "Fees and disbursements of counsel" is synonymous with "attorney's fees" and is oft-used boilerplate for contract provisions allowing recovery of attorney's fees and costs. *See, e.g.*, *Fallon Elec. Co., Inc. v. Cincinnati Ins. Co.*, 121 F.3d 125, 126, 129 (3d Cir. 1997); *Day v. Gen. Elec. Credit Corp.*, 546 A.2d 315, 320-21 (Conn. App. Ct. 1988); *Fry v. Toth*, 166 N.W.2d 235, 237, 239 (Wis. 1969). The district court properly awarded JPMorgan's attorney's fees and costs.

### D.  Postjudgment Asset-Discovery Order

As we have explained, the parties have done battle in extensive supplementary proceedings while this appeal

has been pending. Presently before the court is Asia Pulp's appeal from the district court's order declining to stay enforcement of JPMorgan's asset-discovery citations. As to that order, we now conclude that we lack appellate jurisdiction. Judge Holderman's order denying a stay and compelling compliance with the asset-discovery citations is not a final, appealable order under 28 U.S.C. § 1291.

We "treat [a] postjudgment proceeding like a freestanding lawsuit and look for the final decision in that proceeding to determine the scope of" appellate review. *Solis v. Current Dev. Corp.*, 557 F.3d 772, 775 (7th Cir. 2009). Thus, "an order that addresses all the issues raised in the motion that sparked the postjudgment proceedings is treated as final for purposes of section 1291." *Id.* at 776. In other words, the question is whether the district court's order completely disposes of *the postjudgment proceedings*, not a single issue within those proceedings. A contrary approach would permit piecemeal appeals of interlocutory orders in ongoing postjudgment proceedings. *Id.* at 775-76.

We have previously held that orders granting postjudgment discovery are not final, appealable orders. *See Cent. States, Se. & Sw. Areas Pension Fund v. Express Freight Lines, Inc.*, 971 F.2d 5, 6 (7th Cir. 1992); *In re Joint E. & S. Dists. Asbestos Litig.*, 22 F.3d 755, 760 (7th Cir. 1994). In *Asbestos Litigation* we held that "[t]he denial of a motion to quash the citation proceeding simply lets the pro-

ceeding continue and therefore is not final or appealable."[10] 22 F.3d at 760. The district court's denial of Asia Pulp's motion to stay is no different than the denial of the motion to quash in *Asbestos Litigation*. It is not the end of the postjudgment proceedings—to the contrary, the denial of a stay simply lets those proceedings continue. The district court's order compelling compliance with the asset-discovery citations was not a final, appealable order.

In the alternative, Asia Pulp argues that the district court's order qualifies for immediate review under the collateral-order doctrine, which confers finality on an otherwise interlocutory order if the order conclusively resolves an important question completely separate from the merits of the action and the question is effectively unreviewable on appeal from a final judgment. *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

---

[10] We have speculated that there may be room for exceptions to the rule that orders granting postjudgment discovery are nonfinal. *In re Joint E. & S. Dists. Asbestos Litig.*, 22 F.3d 755, 760 (7th Cir. 1994) (citing *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1224 (7th Cir. 1993)). As in *Asbestos Litigation*, however, this case gives us no reason to explore this possibility. The "circumstances surrounding the ruling of the district court [made] it clear that the court did not regard its ruling as a final disposition of the matter before it." *Id.* at 761. The same is true here. The district court explained that the denial of the motion to stay the citation proceeding "likely will not be this court's last order in the postjudgment proceeding."

"Collateral-order review is based on a practical construction of 28 U.S.C. § 1291; it is not an exception to the final-judgment rule." *Ott v. City of Milwaukee*, 682 F.3d 552, 554 (7th Cir. 2012) (internal quotation marks omitted). In making the collateral-order determination, we "do not engage in an 'individualized jurisdictional inquiry.'" *Mohawk Indus.*, 130 S. Ct. at 605 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978)). "Rather, our focus is on 'the entire category to which a claim belongs,'" *id.* (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1992)), and whether "the class of claims, taken as a whole, can be adequately vindicated by other means," *id.*

Asia Pulp's motion to stay enforcement of the asset-discovery citations conclusively resolved an important question—whether Asia Pulp is entitled to rely on the Indonesian injunction to resist discovery of its assets—but this question is coextensive with, not distinct from, the merits of the postjudgment proceedings. The purpose of the postjudgment proceedings is to discover assets that might be available to satisfy the judgment, and, following discovery, to execute on those assets. *Bank of Am., N.A. v. Veluchamy*, 643 F.3d 185, 188 (7th Cir. 2011). Asia Pulp claims that the terms of the Indonesian injunction prevent it from complying with the asset-discovery citations. This claim goes to the heart of the supplementary proceedings.

Moreover, under *Mohawk Industries*, Asia Pulp cannot establish that the issue is effectively unreviewable if a collateral review is not allowed. In *Mohawk Industries* the

Supreme Court concluded that collateral-order appeals were not permitted from pretrial discovery orders adverse to the attorney-client privilege. 130 S. Ct. at 606. The Court held that postjudgment appeal was sufficient to protect the interests secured by the privilege. *Id.* The Court emphasized that piecemeal appeals "undermine[] efficient judicial administration and encroach[] upon the prerogatives of district court judges." *Id.* at 605 (internal quotation marks omitted). The Court thus refused to expand the scope of collateral-order review to include claims of privilege, noting that several options exist for cases raising particularly acute concerns: interlocutory appeal by certification under § 1292(b), mandamus, and appeal from a contempt citation. *Id.* at 607-08. We have recently observed that the "overriding lesson from *Mohawk Industries* is that the class of collaterally appealable orders must remain narrow and selective in its membership." *Ott*, 682 F.3d at 555 (declining to extend collateral-order review to the denial of a motion to quash a nonparty subpoena for pretrial discovery).

If the privilege claim in *Mohawk Industries* failed to satisfy the requirements of the collateral-order doctrine, it's hard to see how the present claim could qualify. Asia Pulp insists that without collateral review, it may be subject to monetary sanctions for violating the Indonesian injunction if forced to comply with asset discovery here. We note for starters that the district court found that Asia Pulp failed to establish this as a matter of fact; on the record before the court, the status and effect of the injunction was unclear. Even assuming the possibility of sanctions, Asia Pulp has not demonstrated that the

conflict-of-law question is effectively unreviewable if appeal is postponed until supplementary proceedings have concluded. "That a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment . . . has never sufficed.'" *Mohawk Indus.*, 130 S. Ct. at 605 (quoting *Digital Equip. Corp.*, 511 U.S. at 872). We note as well that the procedural options that the Supreme Court found to be adequate alternatives for review of the privilege claim in *Mohawk Industries*—interlocutory appeal by certification under § 1292, mandamus, and appeal from a contempt citation—are also available here. Accordingly, we hold that the collateral-order doctrine does not extend to the district court's order denying Asia Pulp's motion to stay enforcement of the asset-discovery citations.

For all the foregoing reasons, we AFFIRM the district court's order entering summary judgment in favor of JPMorgan in its entirety. The appeal from the order denying Asia Pulp's motion to stay enforcement of JPMorgan's asset-discovery citations is DISMISSED for lack of jurisdiction.