Kanne, Circuit Judge.
 

 American Airlines employed Kimberly Bilinsky for more than two decades. That employment continued without issue after Bilinsky contracted multiple sclerosis ("MS") in the late 1990s. American provided a "Work from Home Arrangement" ("WFHA"), which permitted Bilinsky to do her job from her home in Chicago, even though her colleagues operated out of the company headquarters in Dallas. But after a 2013 merger, American restructured its operations and informally repurposed Bilinsky's department. The executives determined that the new duties required the in-person involvement of the employees, so the company rescinded the arrangement and demanded that Bilinsky relocate to Texas to work face-to-face. Once negotiations collapsed, American terminated Bilinsky.
 

 This lawsuit under the Americans with Disabilities Act ("ADA") followed.
 
 42 U.S.C. § 12111
 

 et seq
 
 . The district court granted summary judgment to American, finding that Bilinsky was no longer qualified for the position in light of the changes in her responsibilities. Because Bilinsky's evidence does not counter that assertion, we affirm.
 

 I. BACKGROUND
 

 American hired Bilinsky in 1991. She served in several positions, taking on a role in 2007 as a communications specialist in the Flight Service Department, located in Dallas at the company's headquarters. But according to Bilinsky's medical records, excessive heat aggravates her MS symptoms and causes her discomfort and reduced functioning. Under the WFHA, American permitted Bilinsky to work from Chicago, where hot weather is less of a concern. She usually traveled to Dallas one day per week to meet with colleagues and perform tasks that required a physical presence.
 

 Bilinsky's duties included participating in conference calls, administering an internal website used to distribute information to flight attendants, publishing articles intended for consumption by flight attendants, producing e-mail communications to employees, and preparing remarks for her boss's weekly internal video announcement. The position had no formal, written job description. Bilinsky performed successfully for several years, and there is no record of complaints or disciplinary action against her.
 

 American merged with US Airways in 2013. The resulting company (still American Airlines) had to integrate the operations of both airlines into a single entity with common policies and procedures. Hector Adler, the Flight Service Department's Vice President at that time, testified that "[i]t was a very extensive and significant task that involved nearly every person in the department." As the process dragged on, Adler felt that existing work arrangements were insufficient to meet the demand. The department expanded its workload, transitioning from primarily producing written communications to putting on live events and performing crisis management functions. The additional work caused the Dallas employees to feel "spread very thin at times."
 

 Under the circumstances, Adler unilaterally decided to require all employees to be physically present at headquarters. This decision affected two employees other than Bilinsky: one relocated to Dallas, but the other refused and was terminated. Upon learning of the impending changes, Bilinsky spoke with her immediate supervisor, Cathy Scheu, on May 20, 2014. Bilinsky emphasized that her WFHA was a necessary accommodation for her disability and that relocating to Dallas was not an option. Scheu communicated the information to Adler, but Adler indicated his intent to deny the request.
 

 Later that year, Scheu and Human Resources representative Rhonda Nicol-Perrin approached Bilinsky to determine whether the company could make alternative accommodations that would permit Bilinsky to relocate. Bilinsky responded that the company would need to provide "a tube of air conditioning around [her] at all times." She stressed that working at American's Dallas office was not a problem, but living in a hot part of the country year-round and trying to engage in activities outside the office would create a concern.
 

 Scheu and Nicol-Perrin then looked for other positions for Bilinsky. They identified a few jobs in Chicago, but Bilinsky was either not qualified for them or not interested in them. Bilinsky separately applied for a technical writer job in the Flight Service Department. That job was also located in Dallas, but the incumbent had worked remotely. Although the interviewer indicated that she wanted to hire Bilinsky for the position, the company declined to allow Bilinsky to work remotely in the new capacity. The position was vacant precisely because the incumbent had been working from home and was affected by the same policy shift that affected Bilinsky.
 

 Throughout 2014 and early 2015, Bilinsky continued to work as before. Linda Carlson took over as Bilinsky's immediate supervisor after Scheu was promoted. Carlson expressed no complaints about Bilinsky's performance. The issue came to a head in February 2015, when the department helped to produce the American Airlines Leadership Conference in Dallas. Bilinsky was not asked to attend the event or assist with preparations, but Carlson otherwise called upon "anybody who was a warm body" to help with the event. Carlson acknowledged that "if you asked [Bilinsky] to pick up the slack or to do a project, she was always willing." But she immediately qualified that statement: "She just wasn't able to do things that you needed to do to support an event. You can't drive to the hotel that's in Dallas if you're in Chicago." One month after the conference, Scheu and Nicol-Perrin informed Bilinsky that she would need to complete her relocation or leave her job. On May 1, 2015, American terminated Bilinsky's employment.
 

 Bilinsky filed a complaint with the Equal Employment Opportunity Commission and received a "right to sue" letter. She then filed this suit in the federal district court in Chicago. Her complaint alleged three counts: (I) that American failed to accommodate her disability under the ADA; (II) that American retaliated against her for insisting on an accommodation by denying her the technical writer position; and (III) that American failed to accommodate her disability under the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5 § 1-102
 
 et seq
 
 . After discovery, the district court granted summary judgment to American on all three counts, finding that Bilinsky was not a "qualified individual" for the position in light of the changes in her responsibilities, and was therefore ineligible for the ADA's protection. Bilinsky
 appealed the award of summary judgment on counts I and III.
 

 II. ANALYSIS
 

 We review summary judgment
 
 de novo
 
 , considering the evidence in the light most favorable to Bilinsky and drawing all reasonable inferences in her favor.
 
 Miller v. Ill. Dep't of Transp.
 
 ,
 
 643 F.3d 190
 
 , 192 (7th Cir. 2011). Illinois courts "have looked to the standards applicable to analogous federal claims" when evaluating IHRA claims, so we consolidate our analysis of both counts.
 
 Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n
 
 ,
 
 233 Ill.2d 125
 
 ,
 
 330 Ill.Dec. 187
 
 ,
 
 908 N.E.2d 39
 
 , 50 (2009) ;
 
 Teruggi v. CIT Grp./Capital Fin., Inc.
 
 ,
 
 709 F.3d 654
 
 , 659 (7th Cir. 2013).
 

 Bilinsky believes the district court erred in finding that she was not a "qualified individual" under the statute and therefore not entitled to protection. The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to ... the ... discharge of employees ...."
 
 42 U.S.C. § 12112
 
 (a). Discrimination includes "not making reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability who is an ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."
 

 Id.
 

 § 12112(b)(5)(A). A "qualified individual" is one who "can perform the essential functions of the employment position."
 

 Id.
 

 § 12111(8). The statute directs that courts shall give "consideration ... to the employer's judgment as to what functions of a job are essential."
 

 Id.
 

 The EEOC has defined "essential functions" as "the fundamental job duties of the employment position"; they do not include "marginal functions."
 
 29 C.F.R. § 1630.2
 
 (n)(1). In interpretive guidance, the EEOC has noted that, when assessing the essential functions of a job, "the inquiry will then center around whether removing the function would fundamentally alter that position."
 

 Id.
 

 § 1630 App. "To determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position."
 
 Rooney v. Koch Air, LLC
 
 ,
 
 410 F.3d 376
 
 , 382 (7th Cir. 2005) (citing
 
 29 C.F.R. § 1630.2
 
 (n)(3) ). We also consider "[t]he consequences of not requiring the incumbent to perform the function."
 
 Miller
 
 ,
 
 643 F.3d at 198
 
 .
 

 The district court's judgment rested on its conclusion that Bilinsky was not a "qualified individual" under the ADA. "[A] worker has no claim under the ADA if she, even with a reasonable accommodation, cannot do the job for which she was hired."
 
 DePaoli v. Abbott Labs.
 
 ,
 
 140 F.3d 668
 
 , 674 (7th Cir. 1998) (citing
 
 Matthews v. Commonwealth Edison Co.
 
 ,
 
 128 F.3d 1194
 
 , 1195 (7th Cir. 1997) ). When defining a job's essential functions, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description ... for the job, this description shall be considered evidence of the essential functions of the job."
 
 42 U.S.C. § 12111
 
 (8).
 

 "Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job."
 
 DePaoli
 
 ,
 
 140 F.3d at
 
 674 (citing among other sources,
 
 42 U.S.C. § 12111
 
 (8) and 29 C.F.R. Pt. 1630, App. § 1630.2(n) ). But we've also cautioned that although "the employer's judgment is an important factor, ... it is not controlling."
 
 Miller
 
 ,
 
 643 F.3d at 198
 
 . "The ADA does not give employers unfettered discretion to decide what is reasonable."
 

 Id.
 

 at 199
 
 .
 

 "The essential-function inquiry is a factual question,
 
 not
 
 a question of law."
 
 Brown v. Smith
 
 ,
 
 827 F.3d 609
 
 , 613 (7th Cir. 2016). The plaintiff "bears the initial burden of establishing that she was a qualified individual who could perform the essential functions of her position."
 
 Taylor-Navotny v. Health All. Med. Plans, Inc.
 
 ,
 
 772 F.3d 478
 
 , 493 (7th Cir. 2014). Both parties agree that Bilinsky's MS is a qualifying disability under the statute, and American concedes that Bilinsky was qualified to do the job with her accommodation prior to the 2013 merger. But it argues that the merger fundamentally changed the position's nature and that consistent, physical presence on site became an essential function of the position at some point after 2013. Because Bilinsky could not perform that function from her home in Chicago, and because she was unable to relocate to establish a physical presence, American contends that she was not qualified for the transformed position.
 

 In
 
 Miller
 
 , a highway worker suffered a panic attack while working on a bridge suspended high above a river.
 
 643 F.3d at 193
 
 . Diagnosed with acrophobia, he requested an accommodation that he not be assigned to any jobs requiring him to work more than 25 feet in the air.
 

 Id.
 

 The employer determined that such work was an essential function of his job and terminated him.
 

 Id.
 

 at 193-94
 
 . The district court agreed and granted summary judgment. But we reversed, believing that there was a genuine dispute of material fact over whether such work was truly essential to Miller's job. Applying the EEOC regulations, we thought it important to "look to evidence of the employer's actual practices in the workplace."
 

 Id.
 

 at 198
 
 . Because the bridge crew had a history of divvying up tasks to crew members based on their "individual abilities, preferences, and limitations," "Miller's request for reasonable accommodation did not ask [the employer] to do anything it was not already doing."
 

 Id.
 

 at 200
 
 . There was a genuine dispute over whether conducting work high in the air was essential, and it should have been left to a jury to resolve.
 

 But we came to the opposite conclusion in
 
 Taylor-Navotny
 
 . There, an employee's MS symptoms kept her from maintaining a regular schedule.
 
 772 F.3d at 483
 
 . She came into the office at varied hours and could not plan her schedule in advance.
 

 Id.
 

 She requested a work-from-home arrangement, but even then, she failed to sign online at regular hours or attend meetings by phone consistently.
 

 Id.
 

 at 486-87
 
 . The employer let her go, and the district court granted summary judgment to the employer because Taylor-Navotny could not perform the job's essential functions, such as regular attendance. We affirmed. Although we had sometimes observed that regular attendance and punctuality are not essential functions of every job, we stressed that "an employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance."
 

 Id.
 

 at 489
 
 (quoting
 
 Basden v. Prof'l Transp., Inc.
 
 ,
 
 714 F.3d 1034
 
 , 1037 (7th Cir. 2013) ). Working from home was not the issue;
 

 instead, wherever the employee might be, she needed to be available and participating during normal working hours.
 
 Id.
 
 at 490. We affirmed summary judgment.
 
 Id.
 

 This case falls somewhere between those two poles. Bilinsky makes the same claim as the plaintiff in
 
 Miller
 
 : she was able to do the job successfully for years, and her termination resulted merely from a change in her boss's preferences about working arrangements that did not accurately state the position's essential functions. Although American acknowledges that Bilinsky was once able to perform the essential functions with a reasonable accommodation prior to the 2013 merger, it contends that those functions changed upon restructuring. The nature of her team's work evolved from independent activities (curating content on a website, responding to written questions from employees, etc.) to team-centered crisis management activities, involving frequent face-to-face meetings with team members on short notice to coordinate work.
 

 Those facts distinguish this case from
 
 Miller
 
 . There, the highway construction crew's work continued as it had before; there were no changes in their duties due to intervening events. The plaintiff's medical condition was the only factor that changed over time. We reversed a grant of summary judgment because the plaintiff produced evidence showing that his request for an accommodation "did not ask [his employer] to do anything it was not already doing."
 
 643 F.3d at 200
 
 . The accommodation he requested was already something that occurred in "the normal course" of the crew's duties.
 

 Id.
 
 See also
 

 EEOC v. McLeod Health, Inc.
 
 ,
 
 914 F.3d 876
 
 (4th Cir. 2019) (reversing summary judgment for employer where there was no evidence of a change in the plaintiff's job duties, but only a possible deterioration in her medical condition).
 

 Bilinsky faces a different problem: evidence of a change in job responsibilities for everyone in her department. The district court determined that "[d]eference to American's judgment as the employer is required in the absence of an adequate factual legal basis to abandon that deference."
 
 Bilinsky v. Am. Airlines, Inc.
 
 , No. 16-c-4253,
 
 2018 WL 4181481
 
 at *7 (N.D. Ill. Aug. 31, 2018) (citing
 
 Gratzl v. Office of Chief Judges
 
 ,
 
 601 F.3d 674
 
 , 679 (7th Cir. 2010) ;
 
 DePaoli
 
 ,
 
 140 F.3d at
 
 674 ). American produced testimony from several employees stating that the nature of the work slowly evolved after the merger and changed the essential functions of Bilinsky's job. Those employees included Adler (VP of Flight Service), Scheu (Bilinsky's first supervisor), and Carlson (Bilinsky's subsequent supervisor). They all uniformly testified about the unique stress the merger caused, the changing day-to-day responsibilities of employees in the department, and the increased demand for services that only local employees could provide. Those with personal knowledge of Bilinsky's circumstances testified that she performed as well as she could given her accommodation, but that there remained a gap that Bilinsky (and the other remote employees) could not fill.
 

 To counter American's assertions, Bilinsky points primarily to her experience in the position prior to the merger, as well as her continued success after the merger occurred. Those are important considerations in the EEOC's list of factors, but as the district court correctly noted, Bilinsky's success prior to the merger does not address whether the essential functions of her job changed some time after the merger.
 

 Similarly, while evidence that Bilinsky performed successfully post-merger would be probative of her qualification for the updated position, testimony from her co-workers
 did not support that proposition. Bilinsky's best evidence is testimony from Linda Carlson, her manager after Cathy Scheu departed in late 2014. Carlson testified that Bilinsky willingly agreed to take on extra work for other employees when live events were taking place and they could not be at their desks: "If you asked Kimberly to pick up the slack or to do a project, she was always willing. I don't recall her ever not being willing to help or pick up slack." But in the same breath Carlson gave testimony that undermines Bilinsky's case: "[Bilinsky] just wasn't able to do things that you needed to do to support an event. You can't drive to the hotel that's in Dallas if you're in Chicago. You can't go check out [AV] equipment in Chicago. You can't meet with subject matter experts to directly, you know, get photographs." "[Other employees] would be frustrated they didn't have another set of hands to divide and conquer work that had to be done there. ... And I[,] like the team[,] felt spread very thin at times." The testimony establishes Bilinsky's willingness to perform, but it does not create a genuine dispute over her ability to fill the gap.
 

 At best, Bilinsky's evidence shows that the job responsibilities evolved slowly. That partially distinguishes this case from
 
 Gratzl
 
 . There, a court reporter suffered from incontinence and required frequent, unplanned bathroom breaks.
 
 601 F.3d at 676-77
 
 . That made her ill-suited to working in a courtroom, so she worked in a central control room in a specialist position.
 

 Id.
 

 at 677
 
 . But the state later eliminated the specialist position and put all court reporters in the same job category.
 

 Id.
 

 The county's chief judge determined that all court reporters would henceforth participate in a rotation through all courtrooms, an arrangement that did not accommodate Gratzl's needs.
 

 Id.
 

 After negotiations broke down, Gratzl sued.
 

 Id.
 

 at 678
 
 . The district court granted summary judgment to the employer, and we affirmed. We determined that Gratzl could not "prove that she [was] qualified for her current job simply by citing evidence that she was qualified for a previous job, with different essential functions, that ha[d] been eliminated."
 

 Id.
 

 at 680
 
 .
 

 Bilinsky's case is not quite so black-and-white, as American never eliminated her position and did not have a written job description that it updated to reflect new circumstances. But the fact that American transitioned the department to new responsibilities slowly rather than all at once does not mean that the job's essential functions didn't change at some point after the merger. To that extent, the rule in
 
 Gratzl
 
 applies equally to this case: "Just as an employer is not required to create a new position or strip a current job of its essential functions [under the ADA], an employer is not required to maintain an existing position or structure that, for legitimate reasons, it no longer believes is appropriate."
 
 Id
 
 .
 

 Bilinsky's remaining challenges focus on the sufficiency of American's evidence. But at the summary judgment stage, the district court's job was not to weigh the evidence but merely to determine whether there was a genuine dispute of fact.
 
 [1]
 
 American's
 witnesses specifically identified only one major event for which Bilinsky was absent: the 2015 Leadership Conference. Bilinsky argues that a single event is not enough to establish a pattern, but she offered no countervailing evidence to show that the conference was an isolated event rather than one example of a regular occurrence.
 

 We stress that our holding today is confined to the unique facts of this case. The ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."
 
 42 U.S.C. § 12101
 
 (b)(1). The statute "does not give employers unfettered discretion to decide what is reasonable."
 
 Miller
 
 ,
 
 643 F.3d at 199
 
 . Absent some change in circumstance, an employer may not rescind an accommodation simply because it is inconvenient or burdensome-the statute requires the employer to make reasonable sacrifices to keep disabled persons in the work force. But American faced a unique intervening event: a major merger between two large corporations. The process of synchronizing their former policies and procedures would necessarily lead to some evolution in individual responsibilities, and an employee cannot create a dispute of fact merely by pointing to her ability to perform in the job before the merger occurred (or as the changes evolved). That's especially true when the revocation of WFHAs applied to all remote employees, not only to the disabled plaintiff.
 
 [2]
 

 Finally, we offer a note of caution to future ADA litigants. We once said that "[a]n employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced. ... [I]t would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home."
 
 Vande Zande v. State of Wis. Dep't of Admin.
 
 ,
 
 44 F.3d 538
 
 , 545 (7th Cir. 1995). But we also acknowledged that "[t]his will no doubt change as communications technology advances."
 

 Id.
 

 at 544
 
 . Technological development and the expansion of telecommuting in the twenty-four years since
 
 Vande Zande
 
 likely mean that such an accommodation is not quite as extraordinary as it was then. That inquiry is context-specific; a work-from-home arrangement might be reasonable for a software engineer but not for a construction worker.
 

 "[T]here is a general consensus among courts ... that regular work-site attendance is an essential function of most jobs."
 
 Credeur v. Louisiana
 
 ,
 
 860 F.3d 785
 
 , 793 (5th Cir. 2017) (collecting cases). The position's nature will often require face-to-face collaboration.
 
 EEOC v. Yellow Freight Sys., Inc.
 
 ,
 
 253 F.3d 943
 
 , 948 (7th Cir. 2001) (en banc). But not in every instance.
 
 See, e.g.,
 

 Mosby-Meachem v. Memphis Light, Gas & Water Div.
 
 ,
 
 883 F.3d 595
 
 , 603-05 (6th Cir. 2018). Here, the parties agree that telecommuting was reasonable for years before intervening events transformed Bilinsky's duties so that physical presence became an essential function of her job. Litigants (and courts) in ADA cases would do well to assess what's reasonable under the statute under current technological capabilities, not what was possible years ago.
 

 Because it based summary judgment on the finding that Bilinsky was not a qualified individual, the district court did not
 reach the issue of whether American engaged in the interactive process to afford Bilinsky an alternative accommodation. We do not reach that issue, either.
 

 III. CONCLUSION
 

 Bilinsky's condition prevented her from living in Texas. American accommodated that disability for several years by permitting her to work from her home in Illinois. But after a major merger, her employer determined that its remote arrangements were insufficient to meet business demands, and it uniformly rescinded those arrangements with all its employees, disabled and non-disabled alike. For the foregoing reasons, the judgment of the district court is AFFIRMED.
 

 The district court did briefly discuss weighing the evidence between the two parties.
 
 See
 

 Bilinsky
 
 ,
 
 2018 WL 4181481
 
 at *6 ("But these facts do not sufficiently
 
 outweigh
 
 American's judgment and so Bilinsky does not provide the Court with an adequate factual dispute.") (emphasis added). But the court seems to have used the term while determining whether Bilinsky had enough evidence to overcome the presumption that an employer's understanding of the essential factors of a job is correct.
 
 See
 

 Basith v. Cook Cty.
 
 ,
 
 241 F.3d 919
 
 , 928 (7th Cir. 2001). The district court did not err.
 

 Bilinsky produced evidence that some employees were permitted to remain in Arizona after the new policy went into effect. The record shows that those employees' positions were not based out of Dallas (as was Bilinsky's) and that they were using legacy operating systems that had not yet been imported to the Dallas facility.