In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

No. 21-2752

LARRY TATE,

*Plaintiff-Appellant,*

*v.*

THOMAS J. DART, *et al.,*

*Defendants-Appellees.*

―――――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-08888 — **John F. Kness**, *Judge.*

―――――――――――

ARGUED SEPTEMBER 9, 2022 — DECIDED OCTOBER 25, 2022

―――――――――――

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellant Larry Tate has worked for the Sheriff of Cook County in the Department of Corrections since 2007. In his third year as a correctional officer, Tate suffered a back injury. He returned to work under medical restrictions that required him to "avoid situations in which there is a significant chance of violence or conflict." After Tate was promoted to sergeant, the Sheriff's Office agreed to accommodate this medical restriction by allowing him to

work in the Classification Unit, where the possibility of violence or physical conflict was relatively remote.

But when Tate sought a promotion to lieutenant, he was told that the Sheriff could not accommodate him in that position. Correctional lieutenants had to be "able to manage and [defuse] regular, violent situations involving inmates." Since Tate's medical restrictions would prevent him from performing this essential function, the Sheriff's Department said, he would remain a sergeant. Tate sued for alleged violations of the Americans with Disabilities Act and the Illinois Human Rights Act. On cross-motions for summary judgment, the district court found that the undisputed facts show that responding to inmate violence in emergencies is an essential function for lieutenants, so Tate was unable to perform the essential functions of the job he sought. *Tate v. Dart*, 2021 WL 3737728 (N.D. Ill. Aug. 24, 2021). Although the district court's opinion was too deferential to the employer's views about which job functions are essential, we agree with the court's bottom line and affirm.

I.   *Facts for Summary Judgment*

These facts are undisputed or reflect the evidence in the light reasonably most favorable to Tate, against whom summary judgment was granted. The Cook County Sheriff's Office hired Tate as a correctional officer in October 2007. Three years later, after lifting some trays at work, Tate felt some pain in his back. He had to take time off, and when he returned to work, healthcare providers had placed him on several medical restrictions. He could not lift more than 60 pounds and could not stand or walk for prolonged periods, and he needed to change his position frequently and was to "avoid situations in which there is a significant chance of violence or conflict."

Tate continued to work under these medical restrictions after he was promoted to sergeant in 2012. But in 2014, Tate sued the Sheriff's Office under the Americans with Disabilities Act, alleging discrimination and failure to accommodate. The parties settled. The settlement agreement provided that Tate would remain a sergeant and continue working in the Classification Unit. The settlement addressed the possibility of a future promotion to lieutenant. Tate could apply for another assignment or seek promotion to lieutenant in the future if he could "perform the essential functions of the assignment or position."

In 2015 Tate sought promotion to lieutenant. He passed the promotional exam and was certified as eligible for promotion. On December 9, 2016, Tate was provisionally promoted to lieutenant. Like all newly promoted lieutenants, Tate was to be subject to a one-year probationary period.

That same day, however, Tate met with Human Resources Officer Rebecca Reierson and ADA Compliance Officer Sabrina Rivero-Canchola, who told him that "his promotion was contingent on him obtaining medical clearance from his physician." They told Tate that lieutenants had to be able to handle disruptive behavior and respond to emergency situations. These were "essential functions," a critical concept under the ADA. When Tate's doctor declined to modify his medical restrictions, Reierson told Tate that it would not be possible to accommodate him as a lieutenant. Lieutenants play an "important and crucial role … in maintaining the safety and security of [the] jail," she said, and they "frequently respond to incidents that require use of force." Lieutenants must be "able to manage situations that involve both conflict and violence." Although Tate was encouraged to suggest accommodations

that might "enable [him] to perform the essential functions" of a lieutenant, Reierson cautioned him that "avoidance of situations involving violence or conflict is not a reasonable accommodation."

About two weeks later, Tate submitted his written ADA accommodation request. He described his lifting, standing, and walking restrictions and noted that he was to "avoid situations involving significant chance of violence." To accommodate these restrictions, Tate suggested "avoid[ing] frequent inmate contact" through assignment to "minimum inmate areas," including classification, laundry, external operations, warehouse, and kitchen. Reierson denied this request: "Violent situations involving inmates arise on a daily basis," and lieutenants must be "able to respond to emergency situations and [defuse] disruptive behavior with de-escalation or use of force." Even in areas like "the kitchen, laundry, or external operations," lieutenants "interact[] with inmates who are assigned to work in those areas" and are "still required to respond to emergency situations and incidents involving inmates that arise … anywhere within the Division … no matter how frequent or infrequent they occur." Because Tate's medical restrictions meant he would be unable to handle that essential function as a lieutenant, the Sheriff's Office returned Tate to the rank of sergeant.

## II. *Procedural History*

Tate filed charges of discrimination with both the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. The EEOC issued a right to sue letter, and Tate filed this lawsuit alleging disability discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and in violation of

the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. The parties filed cross-motions for summary judgment. The district court granted summary judgment to the defendants. Tate appeals the denial of his claims under the ADA and the IHRA. Because Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework, we focus on the federal ADA claims. See *Fox v. Adams & Assocs., Inc.*, 2020 IL App (1st) 182470, 445 Ill. Dec. 342, 166 N.E.3d 772, 783–88 (2020).

III. *Analysis*

A. *Legal Standard*

We review a district court's grant of summary judgment de novo, without deference to the district court, giving the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from the evidence. *Majors v. General Electric Co.*, 714 F.3d 527, 532 (7th Cir. 2013). When a motion for summary judgment asserts that the opposing party cannot meet his burden of proof on a decisive issue, the opposing party must come forward with evidence sufficient to permit a finding in his favor that there is a genuine dispute of material fact. *Id.*

B. *"Essential Functions" under the ADA*

The central issue in this appeal is whether there is a genuine dispute of material fact as to whether being able to respond in emergencies to inmate violence is an "essential function" of the correctional lieutenant position at the Cook County Department of Corrections.

The ADA prohibits discrimination, including denial of promotions, against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A qualified individual is

someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). An employer must therefore make reasonable accommodations that will allow a qualified individual to perform the essential functions of his or her job. *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 197 (7th Cir. 2011); 42 U.S.C. § 12112(b)(5)(A).

The Sheriff's Office argues, and the district court agreed, that the ability to respond physically to emergencies involving inmate violence is an "essential function" for all lieutenants in the department, and that Tate's medical restrictions prevent him from performing that essential function. Tate's principal argument is that the ability to respond physically is not, as a matter of fact, a truly essential function of all lieutenant jobs. We focus first on that issue. Tate also contends that his medical restrictions do not actually mean that he could not respond physically to inmate violence in an emergency. We conclude by addressing that contention.

Whether responding to violent emergencies is an essential function of the lieutenant position "is a factual question, *not* a question of law." *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) (emphasis in original). As the district court correctly observed, to answer that question, "we consider the employer's judgment, including written job descriptions, as evidence." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020). We also "examine the impact of not requiring the employee to perform the function." *Vargas v. DeJoy*, 980 F.3d 1184, 1188 (7th Cir. 2020).

The statutory text of the ADA provides little guidance on how to determine whether a particular job function is

essential or not, but regulations implementing the ADA iden-
tify seven non-exclusive categories of evidence to consider:

> (i) The employer's judgment as to which
>      functions are essential;
>
> (ii) Written job descriptions prepared before
>      advertising or interviewing applicants for
>      the job;
>
> (iii) The amount of time spent on the job per-
>      forming the function;
>
> (iv) The consequences of not requiring the in-
>      cumbent to perform the function;
>
> (v) The terms of a collective bargaining agree-
>      ment;
>
> (vi) The work experience of past incumbents in
>      the job; and/or
>
> (vii) The current work experience of incum-
>      bents in similar jobs.

29 C.F.R. § 1630.2(n)(3).[1]

---

[1] On appeal, the Sheriff asserts incorrectly that this court considers
this EEOC regulation without deference and "solely as persuasive author-
ity." For support, the Sheriff's brief quoted portions of an opinion of this
court that were later amended, *Bilinsky v. American Airlines, Inc.*, 928 F.3d
565 (7th Cir. 2019). Appellees' Br. at 14. In our research, we found that, at
the time of oral argument, Westlaw provided the amended version of
*Bilinsky*, while Lexis provided only the unamended version, so we can un-
derstand how a conscientious lawyer could make that mistake. The
amended version of *Bilinsky* is precedential; the original version is not. In
any event, we have repeatedly relied on this EEOC regulation in deciding
essential-function questions. E.g., *Shell v. Smith*, 789 F.3d 715, 717–18 (7th
Cir. 2015); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285–86 (7th Cir.

The employer's judgment is a factor, and an important one, but it is not necessarily decisive. Our cases have often noted that some degree of deference is appropriate, but an employer's stated judgments about which functions are essential may or may not be consistent with the job as actually performed, or perhaps even as set forth in written job descriptions. See *Mlsna v. Union Pacific R.R. Co.*, 975 F.3d 629, 634 (7th Cir. 2020) (reversing summary judgment for employer: "'We usually do not "second-guess the employer's judgment in describing the essential requirements for the job." But this deference is not unqualified.'"), quoting *Tonyan*, 966 F.3d at 687 (affirming summary judgment for employer); *Miller*, 643 F.3d at 198 ("the employer's judgment is an important factor, but it is not controlling").

Careful attention to the regulation's other evidentiary factors can counter the employer's judgment. See *Tonyan*, 966 F.3d at 688 (reminding that we must "also look to the reality on the ground" and listing the other EEOC categories of evidence); *Shell*, 789 F.3d at 718 (reversing summary judgment for employer: "The district court, in giving deference to the City's position, did not consider any of the other § 1630.2(n) factors."); *Miller*, 643 F.3d at 198 (reversing summary judgment for employer after juxtaposing the "employer's judgment" with "the employer's actual practices in the workplace").

---

2015); *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012); *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 663 n.8 (7th Cir. 2001); *Lenker v. Methodist Hosp.*, 210 F.3d 792, 796 (7th Cir. 2000).

### 1. *Employer's Judgment*

Here, the Sheriff argues that the "correctional lieutenant's essential functions include responding to emergency situations and defusing violence." This position has not changed since Tate first requested an accommodation based on his medical restrictions. In December 2016, Reierson told Tate that "it is imperative that Lieutenants are able [to] respond to emergency situations and [defuse] disruptive behavior with de-escalation or use of force. The ability of a lieutenant to respond to dangerous situations is essential to maintaining the safety and security of the jail as well as those working in it." In short, the Sheriff maintains, "it is an essential function of the job."

### 2. *Written Job Description*

The job description here supports finding that responding physically to violent emergencies is an "essential function" of the lieutenant position. According to the description, a "Lieutenant ensures the safety and security of inmates, staff, and citizens through the enforcement of proper detention policies and procedures." And "Key Responsibilities and Duties" include "oversee[ing] the receipt, care, and release of inmates and their belongings, [e]nforc[ing] Cook County Sheriff's Office and Department of Corrections policies and procedures," defusing "and control[ling] disruptive behavior by appropriate verbal orders and/or appropriate use of physical force," and "[r]espond[ing] to emergency situations … such as medical, fire, [and] security."[2]

---

[2] Tate contends that the job description is not wholly reliable because it does not accurately describe actual practices. In support, Tate cites testimony from Kieran Mundt, chief steward for the correctional lieutenants.

Here, the job description reinforces the Sheriff's judgment. Lieutenants are always ensuring safety through enforcement, and although some assignments involve less frequent need for the use of physical force, none of the assignments require no use of force.

3.  *Time Spent Performing the Function and Emergency Responses*

As a general rule, the more time an employee spends performing a function, the more essential the function is likely to be. There are exceptions, however, particularly where the job includes emergency response duties. A function that is performed only rarely may still be essential. See *Vargas*, 980 F.3d at 1189 (affirming summary judgment for employer: "an essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential"), quoting *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) (affirming summary judgment for employer).

The special feature of this case is the role of correctional lieutenants in responding to emergencies, including those involving inmate violence. The crux of Tate's argument is that responding to violent emergencies is not an essential function for all correctional lieutenants because some assignments only rarely require the use of physical force. Tate argues that there is less need to respond to violent emergencies as a lieutenant because, as he sees it, "the higher up in rank that you go, the less inmate contact that you" have. Retired Lieutenant

---

Because Mundt's testimony speaks less to the written job description and more to "the employer's actual practices in the workplace," see *Miller*, 643 F.3d at 198, we address his testimony under the EEOC's third and sixth categories of evidence.

Duane Collins and current Lieutenant Thomas Cintron cor-
roborated this view. Correctional jobs become "less physical"
as one moves up in the chain of command. And some lieuten-
ants have rarely, if ever, actually needed to respond with
physical force to counter inmate violence.

The relative frequency with which a lieutenant is required
to use physical force depends in part on a lieutenant's partic-
ular assignment. Chief steward for the correctional lieuten-
ants Kieran Mundt testified that the particular assignment de-
termines how often a lieutenant needs to defuse and "control
disruptive behavior" through the "use of physical force." It
"really depends on where you work." An assignment to
Laundry or Records, for example, will likely require less use
of force. Lieutenant Angela Lewis testified that, as a lieuten-
ant assigned to External Operations and Records, she never
needed to respond to emergency situations or to defuse and
control disruptive behavior with physical force. And Lieuten-
ant Collins testified that he had never fought with an inmate
when he worked in Records.

If the essential-function inquiry were about probabilities,
Tate would have a stronger argument. Yet we cannot lose
sight of the need for emergency responses in law enforcement
and public safety agencies like the Corrections Department of
the Cook County Sheriff. As the district court observed, many
police officers never discharge their service weapons in the
line of duty, but that "does not mean that weapons profi-
ciency for all is optional." Or similarly, as we have noted,
while a firefighter "may not often have to carry an uncon-
scious adult from a burning building, failing to require that
he ably perform this function when called upon would run
counter to his duty to public safety." *Vargas*, 980 F.3d at 1189.

Even Chief Steward Mundt confirmed that, assignments aside, a lieutenant *always* "[e]nforces Cook County Sheriff's Office and Department of Corrections policies and procedures" and "ensures the safety and security of inmates, staff, and citizens through the enforcement of proper detention policies and procedures." So while Tate has offered evidence that the right assignment would mean that he *might* never need to engage physically with any violent inmates, that evidence does not answer whether *being able* to do so is an "essential function" for correctional lieutenants.

    4.   *The Consequences of Not Requiring Performance of the Function*

Under the ADA regulation on essential functions, we also examine "the impact of not requiring the employee to perform the function." *Vargas*, 980 F.3d at 1188, citing 29 C.F.R. § 1630.2(n)(3)(iv). Here, the consequences of not requiring Tate to respond with physical force in violent emergencies could be innocuous, but they could also be grave.

Tate argues that our case law shows that not every employee must always be able to perform every job function. That point is certainly correct as a general rule, and it means that an employer who might prefer that employees be interchangeable may need to bend that preference to accommodate an employee with a disability. The problem for Tate is that the cases establishing that general principle arose in very different contexts: they did not involve jobs with public safety emergency duties.

In *Miller v. Illinois Department of Transportation*, for example, we recognized that where employees work as a team, "*each* member" of the team might not have "to be able to do

*every* task required of the entire team." 643 F.3d at 198 (emphasis in original). In *Miller* one person on a highway bridge crew had been diagnosed with acrophobia—a morbid fear of heights. The issue was whether performing tasks more than 25 feet above the ground was an essential function. *Id.* at 197–98. We reversed summary judgment for the employer because some evidence showed that the bridge crew worked as a team, that no individual was assigned permanently to any one task, and that there was no requirement that bridge crew members rotate from task to task in an organized, routine fashion. We concluded that a reasonable jury could find that it was not necessary for any one member of the bridge crew to be able to do every task of the bridge crew as a whole. *Id.* at 198. The plaintiff had "presented evidence that … the team accommodated the various skills, abilities, and limitations of the individual team members by organizing itself according to those skills, abilities, and limitations." *Id.* Since one team member could not weld, for example, other members of the team would do the welding. *Id.* The same was true with work more than 25 feet above the ground. *Id.* at 197.

*Miller* remains good law, but context matters. In the Cook County Department of Corrections, while the correctional staff surely work as a team in a larger sense, they cannot share the responsibility of responding to violent emergencies and sudden physical altercations by stepping aside and calling others. Responding to a public safety emergency is just not the same as maintaining bridges.

Nor is it the same as being able to drive a bus. In *Brown v. Smith*, one question was whether it was essential for a street supervisor in a local bus system to have a commercial driver's license. 827 F.3d at 613–14 (affirming summary judgment for

employee). Street supervisors generally "helped ensure that
drivers left the bus garage with the requisite paperwork and
with operational vehicles." *Id.* at 612. Occasionally they might
be called upon to drive a bus, but "driving buses was not a
key responsibility for supervisors because other individuals
with CDLs were typically available to drive buses when nec-
essary." *Id.* at 614. A replacement driver "could generally be
secured within 10 minutes." *Id.*

In public transportation and many similar contexts, *Brown*
makes sense. Waiting ten minutes for a replacement bus
driver would not likely cause serious consequences. The same
simply cannot be said in law enforcement or corrections. To
be sure, in certain public safety and law enforcement posi-
tions, a person can sometimes wait for backup in an emer-
gency. But not always. If a firefighter waits ten minutes for a
replacement, the opportunity "to carry an unconscious adult
from a burning building" may be lost. See *Vargas*, 980 F.3d at
1189. The building may have burnt to the ground. The emer-
gency itself dictates when action must be taken. The same rea-
soning applies here. If Tate were unable to respond as needed
to a violent emergency, the consequences could be grave. As
we observed in *Miller*, "task reassignments within a job can be
unreasonable in situations where the reassigned task is an es-
sential function of the job. In those situations, reassignment or
delegation of the task would equate, essentially, to reassign-
ment or delegation of the job itself." 643 F.3d at 199.

### 5. *Collective Bargaining Agreement*

The district court did not discuss the collective bargaining
agreement governing correctional lieutenants, but it is rele-
vant. The agreement creates a seniority-based bidding system
for lieutenants on active duty to bid on vacant assignments.

Although seniority is generally defined as the length of the employee's continuous employment since being hired, lieutenants bidding on vacancies are ranked according to their relative seniority as sergeants. As the Supreme Court has noted, a seniority system will prevail over a requested accommodation "in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002). Based on *US Airways*, we have said that "it is unreasonable to assign an employee to a position as an accommodation if doing so would violate the employer's seniority system." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 854 (7th Cir. 2015) (affirming summary judgment for employer); see also *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996) (affirming summary judgment for employer where employee with disability sought accommodation that would conflict with bona fide seniority system for shift assignments under collective bargaining agreement).

Here, the Sheriff argues that Tate seeks to "override the collective bargaining agreement's seniority-bidding provisions … which the ADA does not require." While it is true that *US Airways* and *Dunderdale* would not require accommodating Tate if the seniority-bidding system were inflexible, the agreement here provides that the Sheriff "will consider such factors as training, education, experience, skills and ability, *in addition to seniority*" when making specific job assignments. (Emphasis added.) *US Airways* has something to say about the presence of such discretionary power.

Discussing "special circumstances" that might override the presumption of unreasonable accommodation that attaches in a seniority system, the Court noted that a "plaintiff might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to

matter." *US Airways*, 535 U.S. at 405. In this case, the Sheriff's discretion to consider factors like "ability, in addition to seniority," creates those special circumstances. While the Court was addressing the reasonableness of a proposed accommodation, its logic still applies to the essential-functions inquiry. The agreement here does not help Tate create a genuine dispute regarding essential functions, and this may be why the district court never discussed it. But the agreement favors Tate in that it at least dispels the Sheriff's argument that the seniority system alone renders Tate's proposed accommodation unreasonable. In most cases, the Sheriff's argument might be strong, but *this* collective bargaining agreement lacks the rigidity present in *US Airways* and *Dunderdale*.

### 6. *Work Experience of Past Incumbents in the Job*

The sixth and seventh regulatory categories taken together speak to "the employer's actual practices in the workplace." *Miller*, 643 F.3d at 198. But they are distinct. The seventh category looks to the "current work experience of incumbents in *similar jobs*." 29 C.F.R. § 1630.2(n)(3)(vii) (emphasis added). Here, those are the officer and sergeant positions. The sixth category considers the "work experience of past incumbents in *the job*." 29 C.F.R. § 1630.2(n)(3)(vi) (emphasis added). Here, that's the lieutenant position, so we start with the evidence on the position Tate seeks.

As noted, both former and current lieutenants testified that they have less physical contact with inmates than do sergeants or officers. Some lieutenants have rarely, if ever, needed to counter inmate violence with physical force. Often they delegate responsibilities for the "receipt, care, and release of inmates" to officers and sergeants. And some assignments are centered on non-physical responsibilities. In

External Operations, lieutenants primarily ensure adequate staffing and conduct rounds. In Records, where Tate has worked as a sergeant, lieutenants focus on overseeing discharges and staff, entering court orders, tracking inmate sentences, and ensuring timeliness. Some of these assignments can be long-term, with some lieutenants remaining in them for years at a time. In another context—one outside the realm of public safety and law enforcement—this sort of evidence might swing the analysis in Tate's favor or at least create a genuine dispute of fact.

But evidence speaking to the actual experiences of lieutenants also works against Tate. Lieutenant Collins testified that in his tenure at Cook County DOC, there had been six riots. While all of these riots occurred before he was promoted, Collins said that riots are "all out," where "all detainees are fighting and all the officers," including lieutenants, "are trying to quell the problem." There is no way to predict when a lieutenant will need to use force, and the need can arise "anywhere in the jail." This anecdotal evidence is supported by undisputed data showing that from November 2016 to November 2018 there were 114 incidents "where correctional lieutenants were required to use force to control inmates."

As we observed in *Miller v. Illinois Department of Corrections*, a "prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have … the capability for such response." 107 F.3d 483, 485 (7th Cir. 1997) (affirming summary judgment for employer). The point is salient for lieutenants as well as officers in light of undisputed evidence showing that lieutenants are not above the need to use physical force,

whether in response to a full-blown riot, just a single unruly inmate, or something in-between. As in *Dargis v. Sheahan*, 526 F.3d 981 (7th Cir. 2008), the evidence Tate has provided is insufficient to create a genuine dispute of material fact. Tate has not offered evidence that any of these lieutenants "*needed* to avoid all inmate contact at all times," even if they held assignments where inmate contact was only limited. *Id*. at 987 (emphasis added) (affirming summary judgment for employer).

### 7. *Current Work Experience of Incumbents in Similar Jobs*

While evidence from similar jobs is helpful, its usefulness has its limits. Here, most of the relevant evidence speaks to the experiences of lieutenants. But Tate's own experience as a sergeant provides some support for the view that responding to violent emergencies might not be an essential function of *all* lieutenant assignments.

Recall that the Sheriff had previously agreed to accommodate Tate's medical restrictions by allowing Tate to work in the Classification Unit, where the possibility of violence or physical conflict was relatively remote. This accommodation was part of a settlement agreement between Tate and the Sheriff's Office that resolved an earlier failure-to-accommodate claim. If it was possible to accommodate Tate's restrictions as a sergeant, why is it not possible to afford him the same accommodations as a lieutenant? The argument has superficial appeal, but it does not persuade us to reverse the district court.

First, the sergeant and lieutenant positions may have many similarities, but they are still different positions. What is true for one position is not necessarily true for another.

Second, just because the Sheriff has accommodated Tate as a sergeant does not mean that responding to violent emergencies is not an essential function of the position. Tate's accommodation as a sergeant may very well go above and beyond what the ADA requires. See *Shell*, 789 F.3d at 720 (reversing summary judgment for employer: if "the duty at issue is an essential function of the job" that the employer "previously accommodated … beyond what the ADA demands when it did not require" the employee to perform the duty, then the employer need not "continue to go beyond the ADA's requirements."); *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) (affirming summary judgment for employer: "an accommodation that the [employer] was not obliged to perform … will not count as evidence that the [modified] position" is the same as the unmodified position); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 929 (7th Cir. 2001) (affirming summary judgment for employer: "[I]f an employer 'bends over backwards to accommodate a disabled worker … it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'"), quoting *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) (affirming summary judgment for employer).

Third, the law should not penalize parties for earlier settlements. This prior accommodation as a sergeant was not gratuitous. It was part of a settlement agreement—a contract. The settlement agreement rests on "'a bargained-for exchange, whereby the promisor … receives some benefit, or the promisee … suffers detriment.'" *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 866 (7th Cir. 2013), quoting *Vassilkovska v. Woodfield Nissan, Inc.*, 358 Ill. App. 3d 20, 294 Ill. Dec. 207, 830 N.E.2d 619, 624 (2005). Here, Tate and the

Sheriff's Office contemplated precisely this situation when they entered the agreement. They bargained for it. Tate was to remain a classification sergeant, accommodating his disability, and he could "seek promotion to Lieutenant at any time in the future provided" that he could "perform the essential functions" of the position. The settlement agreement was an "agreement to accommodate … rather than an admission that" any particular job function was "not an essential function." *Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 671 (8th Cir. 2019) (affirming summary judgment for employer). This does not mean that we wholly discount Tate's experiences as a sergeant, but their usefulness is limited.

Considering all the evidence on all the relevant factors, we agree with the district court that even though violent workplace emergencies might be infrequent, the undisputed facts show that the ability to respond to violent emergencies is an essential function for correctional lieutenants. Although the Sheriff may choose to accommodate a disability like Tate's, the ADA does not require him to excuse Tate from the requirement that he *be able* to respond physically to violent emergencies.

C. *Tate's Alternative Argument*

Tate argues in the alternative that even if responding to violent emergencies is an essential function of the lieutenant position, he actually can "respond to emergency situations if truly necessary." Tate offers the testimony of three correctional lieutenants who have worked alongside him. In their personal opinions, nothing would "prevent" Tate from physically restraining an inmate in an emergency. Regardless of the clear instructions that doctors and nurses have given Tate to "avoid situations in which there is a significant chance of

violence or conflict," he contends he could respond "if necessary" in an emergency.

Tate's alternative argument tries to have it both ways. On one hand, he seeks an accommodation because he is to "avoid situations in which there is a significant chance of violence or conflict." On the other, he seeks to convince us that his medical restriction is not as restrictive as it appears. He argues that the Sheriff's Office simply misunderstands the word "avoid." To Tate, "avoid" does not mean "never do it." It means something more like "limit," and defining it should be part of the ADA's required "interactive process" between Tate and the Sheriff's Office. He argues that the meaning of "avoid" is a question for a jury, not this court. We disagree.

Health care professionals who prescribe these kinds of medical restrictions know the difference between "avoid" and "occasionally" and "sometimes," particularly with respect to the physical demands of jobs. So do we. Federal courts frequently encounter these concepts in judicial reviews of Social Security disability decisions. A typical example appears in *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005), where the administrative law judge wrote that the claimant had the residual functional capacity to: "lift/carry 10 pounds *frequently* and 20 pounds *occasionally*, push/pull 10 pounds *frequently* and 20 pounds *occasionally*, sit 6 hours in an 8–hour day, walk 6 hours in an 8–hour day, stand 6 hours in an 8–hour day, *avoid* all exposure to temperature extremes, *avoid* concentrated exposure to dust/fumes, and no commercial driving." *Id*. at 352 (emphases added).

"Avoid" means "avoid." Merriam-Webster defines "avoid" as "to keep away from, to prevent the occurrence or effectiveness of," and "to refrain from." *Avoid*, Webster's

Third New International Dictionary 151 (unabr. ed. 1993). The Oxford English Dictionary defines "avoid," in the "usual current sense," as "to leave alone," to "keep clear of or away from," to "shun," to "have nothing to do with," and to "refrain from." *Avoid*, 1 The Oxford English Dictionary 823 (2d ed. 1989). "Avoid" does not mean "only occasionally" or "limit," which Merriam-Webster defines as "to restrict the bounds or limits of" or "to curtail or reduce in quantity or extent." *Limit*, Webster's Third New International Dictionary 1312 (unabr. ed. 1993). No, "avoid" is more prohibitive. And it was this prohibitive meaning that the Sheriff's Office naturally discerned when Tate asked for an accommodation.

Tate cannot have it both ways. "Avoid" cannot mean "avoid" under one legal theory and "limit" under another. An employer must respect a medical restriction like Tate's according to its plain meaning. See *Kotaska v. Federal Express Corp.*, 966 F.3d 624, 631 (7th Cir. 2020) (affirming summary judgment for employer: "The ADA, of course, does not obligate an employer to let its employees exceed their doctor's restrictions, even if they think they can."). The Sheriff's Office cannot be required to read the word "avoid" out of Tate's medical restrictions. Tate is not entitled to ask a jury to bend the meaning of those restrictions.

While the district court's opinion was too deferential to the employer's judgment, we agree that, on this record, the ability to respond physically to violent emergencies is an essential function for Cook County correctional lieutenants. Under his medical restrictions, plaintiff Tate cannot fulfill that essential function, so he is not a "qualified individual" for the correctional lieutenant position he sought. The judgment of the district court is AFFIRMED.